Dureee, Judge,
delivered the opinion of the court:
This is an action for disability retirement benefits under section 402(a) of the Career Compensation Act of 1949, 63 Stat. 802, as amended, and found in 10 U.S.C. 1201.
While serving as an artillery officer in combat in Korea, plaintiff was injured on February 15,1951, by an exploding hand grenade. As a result of these wounds, plaintiff suffered considerable diminution of vision in his left eye, and *160 retains several small metal fragments in tlie head and neck.
After protracted treatment of these injuries, on December 19, 1951, the Surgeon General found plaintiff qualified physically for retention on active duty “in any assignment not involving field or combat duty, consideration being given to his physical handicap in his assignment” (finding 12). The evidence indicates that at the time plaintiff did not consider his injuries disqualifying, and that he desired to remain in the service.
Upon reexamination in November 1953, plaintiff was again found physically qualified for retention in service, with recognition again accorded the defective vision of plaintiff’s left eye.
Thereafter, between 1954 and 1957 plaintiff was assigned to duty in Germany where he served at various times as operations officer, commanding officer of a detachment of special troops, intelligence officer, and special services officer. He returned to the United States in late 1957, when he was stationed at Fort Carson, Colorado.
On April 2, 1958, plaintiff appeared before a medical board convened at Fitzsimons Army Hospital, Denver, Colorado. The evidence indicates that at this time plaintiff was seeking disability retirement, and no longer wished to remain in service. The board found plaintiff fit for duty, and recommended that the case be referred to a Physical Evaluation Board.
On April 3, 1958, plaintiff appeared before a Physical Evaluation Board, at which time he was represented by counsel. Plaintiff informed the board that the only disability for which he sought disability retirement was the deficiency in his left eye (finding 18). The board, after, hearing evidence, found that plaintiff suffered from aphakia, left eye and reported the degree of severity as:
“Visual acuity right eye: 20/20: visual acuity left eye; light perception.”
As a matter of fact, plaintiff was at this time virtually blind in his left eye. On the basis of this diagnosis, the board, after noting that the disability was 30 percent disabling under the standard schedule of rating disabilities then em *161 ployed by the Veterans Administration, recommended that plaintiff be permanently retired on account of disability.
Notwithstanding this favorable determination, on April 7, 1958, plaintiff wrote to the Adjutant General, Department of the Army, excepting to the recommendations of the Physical Evaluation Board on the grounds that the board had not considered any of the other disabilities with which plaintiff asserted he was afflicted, and which plaintiff contended should have raised his disability rating. Plaintiff noted as disabilities in addition to his ocular deficiency, foreign' bodies imbedded in his head and left leg, headaches, dizziness, blackouts, loss of touch sensation in his left hand resulting from injury to a nerve in his shoulder, and lack of physical qualifications and training to compete successfully in civilian life.
An Army Physical Review Council in Washington reviewed the proceedings of the Physical Evaluation Board on April 11, 1958, and concluded that plaintiff was physically fit to perform active military duty commensurate with his age and rank under then current Army medical standards as embodied hi the applicable regulations, AR 40-504, paragraphs 2, 5, 6 and 7e.
Plaintiff sought further review of this determination, but was unable to effect its reversal. On June 9, 1958, plaintiff was relieved from active duty in the course of a reduction in Army forces, and not by reason of physical disability. Plaintiff is now a captain in the Army Reserve. In this action plaintiff seeks disability retirement benefits under § 402(a) of the Career Compensation Act of 1949, 63 Stat. 802, as amended, 10 U.S.C. 1201. Based on the facts of his case, to establish entitlement to disability retirement benefits pursuant to section 402(a), plaintiff must establish that the Army was arbitrary or capricious in determining that he was not “unfit to perform the duties of his office, * * * rank or rating because of physical disability” and that the disability was at least rateable at 30 percent under the applicable standards in use by the Veterans Administration.
Sections 413 and 416 of the Act, codified in 10 U.S.C. 1216, authorized the Secretary of the Army to prescribe regula *162 tions to effectuate the legislation, and endow the Secretary with all powers, functions and duties incident to determinations, pursuant to the statute, regarding the fitness for active duty of any member of the service, and percentage of disability.
Plainly, since the statute commits these determinations to the jurisdiction and expertise of the Secretary of the Army, we cannot undertake to determine who is fit, or unfit for military service. O'Brien v. United States, 124 Ct. Cl. 655; Holliday v. United States, 128 Ct. Cl. 647; Prichard v. United States, 133 Ct. Cl. 212; Towell v. United States, 150 Ct. Cl. 422. Only when it appears that the Secretary’s determinations are arbitrary, capricious, unsupported by the evidence, or contrary to the laws and regulations relating to disability retirement will this court exercise its authority to redress the effects of such arbitrary government action by the award of a money judgment.
We find no such extreme error in the Army’s conclusions. At the time he was relieved from active duty, plaintiff had 20/20 vision in his good right eye, but only light perception in the injured left eye. Under the applicable regulations, AR 40-504, as interpreted administratively, the standard for retention allowed for only light perception in one eye if the other eye was corrected to 20/40 or better. Plaintiff’s vision surpassed minimum qualifying standards for retention in service, and thus the Army’s finding of fitness cannot be deemed contrary to the regulations.
Nevertheless, plaintiff contends that he should have been found unfit because he was disabled from performing the duties of his rank and office, i.e. artillery captain. Actually, plaintiff’s argument distills itself to a contention that because it is unlikely that plaintiff would have been permitted to serve as an artillery observer in a combat situation, he was thereby unfit for service and entitled to disability retirement. Plaintiff had been found qualified for service with an E-3 profile. Pursuant to regulations a member with an E-3 profile is qualified for original entrance into the service and commission. Moreover, regulations specifically provide that an officer may be retained in service even though afflicted with disabilities that might preclude original appointment, *163 provided that the infirmities do not prevent performance of continued duty in rank or rating, “including assignments to positions which may be held by an individual regardless of his basic branch.” AR, 40-504, paragraph b(l). Plaintiff served in various capacities quite a number of years after having suffered the injury, without noticeable adverse effects attributable to his disability. While we need not determine for the purposes of this particular case the extent of permissible deviation from the serviceman’s accustomed duties in order to compensate for disability while retaining him in service, we do not believe that the duty assigned plaintiff subsequent to his injury deviated so markedly from its prior course as to make a determination of fitness for duty in rank and office arbitrary.
Under paragraph 2 of AR 40-504, percentage of disability is not of itself determinative of fitness for duty. Rather, the individual’s physical and mental capacities as a whole determine fitness. On the basis of the record concerning plaintiff’s physical and mental capacities as a whole at the time he was relieved from active duty, we conclude that the Army’s determination that he was fit to perform the duties of his rank and office was not arbitrary under the applicable statute and regulations, and was supported by the evidence.
The evidence in the record does not support plaintiff’s allegations that he is suffering from various continuing disabilities, aside from his vision, which render him unfit for retention in service.
In view of the foregoing discussion we conclude that plaintiff is not entitled to recover, and his petition will be dismissed.
It is so ordered.
Reed, Justice (Bet.), sitting by designation; Laramore, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States, a resident of San Angelo, Texas, and was born on May 23,1927.
*164 2.Plaintiff entered upon active duty with the United States Army on February 1, 1949, as a second lieutenant. On August 4,1950, he was promoted to first lieutenant and on March 23, 1954, to the rank of captain, AUS. A summary of his military service from the time he became an apprentice seaman in the Naval Reserve in 1945 follows:
7 September 1945 to30 October 1945-TJSNR (Inactive).
1 November 1945 to 18 February 1947_TJSNR (EAD).
10March 1947 to 18 June 1947_USNR (Inactive).
19 June 1947 to 31 October 1947_USMOR (EAD).
1 November 1947to November 1947_USMOR (Inactive).
3 November 1947 to 1 February 1948-USMOR (EAD).
2 February 1948 to 24 February 1948_USMOR (Inactive).
25 February 1948 to 29 January 1949-USMOR (EAD).
24 January 1949 to 31 January 1949-ORO (Inactive).
1 February 1949 to 9 June 1958_USAR (EAD).
10 June 1958 to present time_USAR (Inactive).
3. On May 10,1949, plaintiff underwent a physical examination at Fort Sill, Oklahoma, and was found qualified for general service. His vision was recorded at the time as 20/20 in both eyes. In 1946 plaintiff had an operation to remove pterygium from his left eye. This is a growth which sometimes covers the eye. There is no evidence that it has recurred. This operation is recorded on the report of plaintiff’s medical history made at Dallas, Texas, on January 11, 1949. Also noted on this report is a reference to a minor brain concussion followed by brief unconsciousness suffered by plaintiff at age 17 in an accident in a shower while a student at Texas A. & M. College.
4. Plaintiff was subsequently trained as an artillery officer with an airborne division and assigned to overseas duty, arriving in Korea in September 1950.
5. Plaintiff and his organization made a jump into North Korea and engaged in combat with the enemy. Plaintiff acted as assistant executive officer and as a reconnaissance officer or forward observer.
6. During a heavy assault on his position by the Communist Chinese on February 15,1951, plaintiff suffered injuries from an exploding enemy hand grenade. Plaintiff remained in combat for several hours after which he was treated at a battalion aid station and later flown to a field hospital and *165 eventually to tbe U.S. Army Hospital, Tokyo, Japan. He suffered periods of unconsciousness before removal from tbe battlefield.
7. A casualty report, dated February 17,1951, prepared by the 674th Airborne Field Artillery Battalion in Korea contains tbe following entry:
Kemarks or Diagnosis: At about 0400 hours 15 Feb. 51, in tbe. vicinity of Wonju, Korea. While directing artillery fire on the enemy from a forward OP, Lt Thompson was wounded on the head, chest, and left arm from grenade fragments and small arm fire. (Evacuated)
8. The record of plaintiff’s hospitalization in the Army hospital in Tokyo on February 19, 1951, shows in part the following:
Init Adm: 3rd Bn Aid Sta 187th ECT APO 301 15 Feb 51, Wonju, Korea.
Dg. 1. 8255. Wound, missile, penetrating, right hand, both arms, both legs, left side of face with penetrating of the brain, asymptomatic in nature, and right shoulder. Median nerve palsy of the left hand, but no artery involved.
Dg. 2. 8713. Foreign bodies, retained, soft tissues of the volar side of the left forearm, middle fossa on the left, half-way between the sella and skull wall, posterior to the left orbit, left preauricular area, both cornea, and conjunctiva, anterior portion of the left thigh, secondary to dg. 1.
Dg. 3. 3831. Cataract, traumatic, left eye.
Dg. 4. 6947. Abscess, without lymph-angitis, n.e.c., left thigh, organic undetermined.
26 Feb 51. 962. Foreign body, removal of, from extremities, n.e.c., from left forearm.
Anesthesia: Local Procaine.
27 Feb 51. 961. Incision and drainage, lesion of extremities, n.e.c., abscess of left thigh, with insertion of small Penrose drain.
Anesthesia: Sodium Pentothal.
962. Foreign body, removal of,. from extremities, n.e.c., metallic foreign body and piece of green cloth from left thigh.
Anesthesia: Sodium Pentothal.
10 Mar 51. 079. Eemoval of foreign bodies, cornea and conjunctiva of both eyes.
Anesthesia: Sodium Pentothal.
*166 9. At the hospital in Tokyo plaintiff underwent a major operation on April 24, 1951, for removal of a foreign body in his left eye. The foreign body was nonmagnetic, and it was determined that it could not and should not be removed at the time. On August 14, 1951, plaintiff underwent another major operation on the eye for a traumatic cataract which was diagnosed as “following a penetrating injury.” The cataract was removed.
10. As a result of his wounds plaintiff required treatment for restoration of the use of his left arm and hand. He had wounds in the left leg and around the knee. There are retained fragments in his leg. He has no difficulty with the leg. X-ray films show plaintiff has retained three or four small fragments in or about his skull, with one or more possibly inside the temporal lobe of the brain itself. The latter is encased in scar tissue and not in the functioning brain cells. There is no evidence of abscesses. Plaintiff has scars on his face, neck, arms and legs as a result of his injury.
11. A report of a medical examination at Brooke Army Hospital, Fort Sam Houston, Texas, dated December 11, 1951, concludes that plaintiff was at that time qualified for military service.
The report of the disposition board proceedings at Brooke on December 12, 1951, noted the absence of the lens in plaintiff’s left eye, and that the vision therein was “20/400 J-Nil Corr. to: 20/20 J-l by +11.75 — 1.25X165 Add +3.00,” and made the following recommendation:
In accordance with the provisions of Par. 16, Section I, Part I, SGO Circular No. 162, dated 12 December 1950, it is recommended that this officer be returned to duty with consideration for his combat experience in Korea, as well as his 6 years’ total service. It is felt that this officer would be of considerable value in a training capacity utilizing his MOS as Field Artillery Unit Commander, or Parachutist. In recommending retention on duty, the following considerations are submitted:
1. Individual desires retention on duty as a member of the airborne Test Section, Army Field Forces Board, Ft. Bragg, N.C., or training assignment at Airborne Training Section, Artillery School, Ft. Sill, Oklahoma.
*167 2. Medical Board recommends retention on active duty in training capacity as above.
3. Patient bas excellent vision in right eye and is aphakic in left. Profile E-3.
12. On December 18,1951, the Adjutant General requested the Surgeon General to make a determination of plaintiff’s acceptability for continued active duty and disposition in accordance with CMD Policy No. 10, “Retention on Active Duty Partially Disabled Military Personnel.”
On December 19,1951, the Surgeon General replied thereto as follows:
1. Medical board proceedings, 12 December 1951, Brooke Army Hospital, Fort Sam Houston, Texas, in the case of First Lieutenant Robert L. Thompson, O-2206114, Artillery-AUS, have been carefully reviewed in this office under the provisions of WCL 30963, dated 7 December 1950.
2. This individual is considered to be physically qualified for retention on active duty under the provisions of the above-mentioned directive either in the zone of the interior or overseas in any assignment not involving field or combat duty, consideration being given to his physical handicap in his assignment.
Plaintiff shortly thereafter was returned to active duty at his request.
13. Plaintiff’s file contains an undated certificate signed by him which states as follows:
I now consider myself sound and well and physically qualified for full military duty with the exception of duty requiring Binoculus Vision. I was considered physically qualified for military service at the time of accomplishment of my last physical examination on or about 16 September 1952 at Fort Sill, Oklahoma.
I am classified as Class 4 Profile, due to defective vision, left eye (20/600 correctable to 20/200). This is due to wounds received in action in Korea, 15 February 1951.
14. On November 6,1953, the plaintiff was reexamined by a physician at the U.S. Army Hospital, Fort Sill, Oklahoma, and found physically capable of performing duties com- *168 mensúrate with Ms rank and experience in. Ms branch of service. The following notation appeared on the certificate: “Limitations: Defective vision, left eye.” The examining physician assigned a profile rating of E-3, which was the same as noted in 1951 in finding 11.
15. In 1954 plaintiff was assigned to duty in Germany. "While there he served a month as an operations officer. Then until about 1955 he was a commanding officer of a detachment of special troops. Thereafter he served as an intelligence officer and as a, special services officer. In late 1957 he returned to the United States and was stationed at Fort Carson, Colorado.
16. On April 2,1958, the plaintiff appeared before a medical board composed of three medical officers, which convened at Fitzsimons Army Hospital, Denver, Colorado. The board made the following findings:
1. x20-415.1 Aphakia, left eye, surgical, secondary to trauma incurred in Korea in 1951 (visual acuity right eye, 20/20; visual acuity, left eye, light perception). Untreated, unchanged. LD: Yes. For Physical Evaluation Board rating purposes tMs corresponds to 6029, Aphakia, unilateral.
2. 2102-496 Foreign bodies, retained, intracranial, secondary to grenade fragment wounds incurred in combat with the enemy near "Wonju, Korea, 15 Feb. 51. Untreated, unchanged. LD: Yes. This condition represents no disability and is not rateable.
3. 9835-400 Neuropathy, median nerve, left, due to trauma when wounded in action as above, manifested by hyperalgesia in the median distribution of the hand. Untreated, unchanged. LD: Yes. This condition represents no disability and is not rateable.
4. Patient is fit for duty with an E-4 profile.
5. Patient is not motivated for further duty, believes that he is incapacitated for military duty, and believes that he should be medically retired.
The board concluded that the plaintiff had no disabilities which would incapacitate Mm for duty and recommended that the case be referred to a physical evaluation board.
17. On April 3, 1958, plaintiff appeared before the Physical Evaluation Board which convened at Fitzsimons Army Hospital. He made a, sworn statement and was cross-exam *169 ined by the board. He was represented by counsel. The board made the following diagnosis:
Aphakia, left eye, surgical, secondary to trauma incurred in combat, 1951.
(Aphakia, unilateral).
The degree of severity was reported as follows: “Visual acuity right eye: 20/20; visual acuity left eye: light perception.”
It was noted that such unfitness was 30 percent disabling in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration. It was recommended by the Physical Evaluation Board that plaintiff be given permanent retirement.
It is found that for all practical purposes the plaintiff was blind in his left eye at this time.
18. In his testimony before the Physical Evaluation Board plaintiff was asked the following question and gave the answer as follows:
Q. Do you have disabilities other than those cited in the proceedings of the Medical Board?
A. I don’t propose to have anything else.
The evidence given then was only on the condition of his left eye. On April 7, 1958, notwithstanding the favorable action of the Physical Evaluation Board in recommending plaintiff’s permanent retirement on account of the disability to his eye, he addressed a letter to the Adjutant General, Department of the Army, Washington, D.C., stating that he did not concur in the recommendations of the Physical Evaluation Board because it had not considered other disabilities which he alleged he had. He stated, “While none of these in itself would render me unfit, I do believe they should be considered in an overall disability determination.”
Plaintiff in his letter asked a higher disability rating based upon greater alleged disability with his left eye, three foreign bodies in his head, headaches, dizziness and blackouts, loss of touch perception in his left hand resulting from damage to the median nerve, injury to his left shoulder, retained foreign bodies in his left leg and lack of physical *170 qualifications and training to compete successfully in civilian life.
19. On April 11, 1958, the proceedings of the Physical Evaluation Board were reviewed by the Army Physical Review Council at the Pentagon. The council concluded:
The member is deemed physically fit for the performance of active military duty commensurate with his age and rank. This finding is in accord, with current army medical standards of fitness and unfitness for retention on active duty. (Paragraphs 2, 5, 6 and 7e, AR 40-504.)
20. By letter of April 15, 1958, from the Adjutant General, plaintiff was advised of the action of the TJ.S. Army Physical Review Council. The letter stated, in part:
2. The Council, composed of qualified medical, legal, and personnel management officers, reviews all cases considered by physical evaluation boards. The purpose of these reviews is to assure uniformity in the recommended findings in accordance with the Career Compensation Act and applicable regulations and precedents.
3. After complete review of the same evidence and records considered by the Physical Evaluation Board, the Council recommended that you be deemed physically fit for the performance of active military duty commensurate with your age and rank. This finding is in accord with current Army medical standards of fitness and unfitness for retention on active duty. (Paragraphs 2, 5, 6 and 7e, AR 40-504.) Consequently, DA Form 199 in your case, has been modified to show a check in the “physically fit” box of Item 14a and a deletion of all subsequent entries through Item 32. Rebuttal considered.
4. Prior to final action being taken on your case, if you desire to render a rebuttal based upon the above, such written statement must be prepared and returned within seven (7) days after receipt of this communication. If you do not desire to exercise the right of rebuttal a statement must be made to that effect by in-dorsement hereon. If reply is not received by the date indicated opposite “S” above, final action will be taken by the Secretary of the Army on the physical evaluation board proceedings as modified. Statement may be forwarded direct to The Adjutant General, Attn: AGPO-SR, Washington 25, D.C. A form indorsement *171 and a self-addressed envelope requiring no postage are inclosed for your convenience.
5. Upon receipt of your rebuttal, the recommended findings of your physical evaluation board, the recommended modified findings of the Army Physical Review Council, and your rebuttal will be considered by the Army Physical Disability Appeal Board. This board is established for the purpose of reviewing cases of a controversial nature to insure that no individual is separated or retired from the Army for physical disability without having received a full and fair hearing. The adjudication of the differences in the recommended findings is made in the name of the Secretary of the Army and is final.
21. By the first endorsement dated April 24, 1958, the plaintiff requested an extension of 30 days for the following stated reasons :
Request permission to appear personally before the Army Physical Disability Appeal Board with counsel, or to have counsel represent me before the Board in order to properly present my rebuttal. The extension is necessary in order to make the necessary arrangements with my counsel and for his study of the case.
By an undated second indorsement the Adjutant General advised the plaintiff that no procedure existed for appearance of a member before the Army Physical Disability Appeal Board and that his rebuttal must be received in that office no later than May 15,1958.
By the fourth indorsement, dated May 12,1958, the plaintiff forwarded his letter of rebuttal.
22. On May 16,1958, the Adjutant General forwarded the proceedings of the Physical Evaluation Board and the Army Physical Review Council with the rebuttal thereto to the Army Physical Disability Appeal Board for review.
On May 22, 1958, the Army Physical Disability Appeal Board considered the case and concurred in the findings of the Army Physical Review Council.
23. By letter dated May 29,1958, the Adjutant General advised the Commanding General, Fitzsimons U.S. Army Hospital, Denver, Colorado, as follows :
1. The findings of the Physical Evaluation Board convened at your hospital on 3 April 1958, in the case *172 of Captain Robert L. Thompson, 02206114, ARTY-USAR, as modified, and his statement of rebuttal have been reviewed. The findings to the effect that he is physically fit for active duty have been approved.
2. Disposition of officer will be made m accordance with the provisions of paragraph 28(a)(4), AR 635-40A, 13 August 1957.
3. It is requested that a copy of this letter be furnished subject officer.
The plaintiff was relieved from active duty not by reason of physical disability but by reason of an authorized reduction in Army strength on June 9,1958, by paragraph 10, special order No. 121, Fitzsimons Army Hospital, Denver, Colorado. His commission as a captain in the Army of the United States terminated on June 9, 1958. He now is a captain in the United States Army Reserve. He has not appealed to the Board for Correction of Military Records.
24. Army regulation No. 40-504, dated June 28,1955, provides in part:
1. Purpose,. These regulations establish standards of fitness and unfitness for retention on duty to secure the maximum efficiency and uniformity in the determination of disabilities which warrant disability separation or retirement or warrant retention in the military service. These standards of fitness and unfitness apply to all personnel of the Army to include members who are scheduled for mandatory separation or retirement, except for those members who were previously accepted for military service with some of the disabilities listed herein as rendering an individual unfit * * * All medical examiners, members of medical boards, physical evaluation boards, Army Physical Review Council and Army Physical Disability Appeal Board will utilize these standards when considering member’s eligibility for disability separation or retirement under AR 15-160, AR 40-680, AR 635-40A and AR 635-40B. Each member’s case will be considered on its individual merits, the object being to aid in the determination of whether or not an individual is physically or mentally qualified for further military service.
2. Evaluation of physical disabilities, a. The Career Compensation Act of 1949 provides benefits for those members who have become unfit to perform the duties of their office, rank, grade, or rating by reason of physical disability and who otherwise qualify under the act. *173 Most members possess some physical imperfections which are recorded in the Veterans Administration Schedule for Eating Disabilities, but this act does not provide rights or benefits for physical disability to membei’s who are not determined to be unfit, regardless of the percentage of disability under that schedule from a single disability or accumulation of disabilities. The fact that a member has physical disability which is rateable in accordance with the Veterans Administration Schedule for Eating Disabilities must not be considered a guide in judging fitness or capacity to perform active duty, but this determination is based wholly on the individual’s physical and mental capacity to serve in the military service. The presence of rateable disabilities, though not causing unfitness under the act, may provide rights and benefits under laws administered by the Veterans Administration and should be made a matter of record whenever discovered.
b. In evaluating physical disabilities due regard will be given to the physical standards set forth in AE 40-100, AE 40-105, and AE 40-115. However, the standards prescribed therein will be liberally interpreted in evaluation of members to determine their physical fitness for retention on active duty; thus members may be found qualified for retention on active duty even though they have diseases, injuries, or infirmities which would disqualify them for original appointment or enlistment, provided that such diseases, injuries, or infirmities are—
(1) Of such nature and. degree as not to affect adversely the performance of continued duty on any assignment commensurate with the individual’s grade or rating including assignments to positions which may be held by an individual regardless of his basic branch.'
_ (2) Not subject to_complications or serious aggravation by reason of continued active duty.
c. Inability to meet established standards for a particular assignment, such as Army aviation or airborne training, or failure to meet officer-candidate school requirements does not of itself entitle an individual to disability retirement.
d. Lack of motivation for service should not influence the examiners in evaluating disabilities under the provisions contained herein. _ Members who are undesirable for retention in the military service or unable to perform effective service primarily because of a personality or character disorder, lack of physical stamina, mental deficiency, or because of minor medical defects which are in themselves not disabling and whose unfitness is pri *174 marily caused by nonmedical factors, as lack of proper motivation, are suitable for administrative disposition in accordance with. AR 40-20, SR 605-225-10, AR 605-200, AR 615-368, AR 635-209, as appropriate.
e. Individuals who have been determined to be physically unfit incident to the service but desire to be retained on active duty and who can be expected to perform satisfactory service based upon experience and/or potential qualifications which are of value to the service may be considered for retention on active duty by the medical board under the provisions of AR 616-41.
*****
5. Application of standards, a. When a commander has reason to believe that any member of his command has become unfit to perform the duties of his office, rank, grade, or rating, he will cause the member to be examined to determine his present medical condition. If medical conditions are disclosed which cast doubt upon fitness for duty, the case should be referred by the examining physician to a medical board whose members will be familiar with the standards of fitness and unfitness as contained in these regulations. The medical board will determine the member’s fitness or unfitness and if eligible, recommend his appearance before a physical evaluation board. An individual who is found to be physically fit by an approved medical board is considered to have had a full and fair evaluation and is not entitled to further disability processing by a physical evaluation board unless so directed by the Secretary of the Army. A member undergoing physical evaluation who disagrees with the finding of fitness as made by the examining physician or medical board should receive an explanation from the medical examiner or by a member of the medical board regarding the requirements of pertinent Army regulations for disability retirement inasmuch as his future performance of effective service is largely dependent upon the degree to which he can be made to understand the decision. It is particularly important that medical examiners and medical boards make the determination of fitness as early as possible during disability processing as the further an individual proceeds in the processing the greater becomes the morale problem should disability separation or retirement not be granted.
*175 SECTION II
EXES
6. Visual standards, a. A finding of fitness will be made for officers and warrant officers with any degree of uncorrected vision which will correct to—
11) 20/40 in one eye and 20/70 in the other eye.
,(2) 20/30 in one eye and 20/100 in the other eye.
,(3) 20/20 in one eye and 20/400 in the other eye. provided that the defective vision is not due to active or progressive organic disease. Whenever the eye condition present is such that visual acuity cannot be corrected to at least 20/40 in the better eye, then this in itself is considered as rendering the individual unfit.
❖ ❖ ❖ ❖ *
d. Diplopia binocular is considered as rendering the individual unfit, provided it is permament, cannot be corrected surgically, and, further, that it is of the severe type, is due to progressive organic disease, is constant, and in the zone less than 20° from the primary position.
$ ‡ ^
7. Miscellaneous eye conditions. The following conditions are not considered to render the individual unfit for active service, except as noted: * * *
e. Cataracts, unless they have progressed to the point that visual loss is in excess as prescribed in paragraph 6 a and b. Unilateral extraction of the cataract may or may not qualify a member for retention on active duty, depending on the medical merits of the case, postoperative visual acuity and residuals, type of cataract or involvement of other eye. Bilateral aphahia should always be considered as rendering the individual unfit.
*1» H» «i» «i»
88. Epilepsy, a. Epilepsy, adequately controlled by medication, is not considered to render an individual unfit. Uncontrolled epilepsy is considered to render the individual unfit. However, careful distinction should be made between true convulsive seizures or other epileptic phenomena and psychiatric reactions. To the degree possible, seizures should be confirmed by direct observation by qualified medical personnel, although the frequency of seizures may be established by any competent lay testimony. The electro-encephalogram, while a valuable instrument in evaluating these cases, neither proves nor disproves existence of epilepsy in any individual case.
*176 b. For the purpose of this regulation, satisfactory control of epilepsy is defined as freedom from seizures of any type, on a therapeutic regime in which the cooperation of the member has been fully extended. Neither controllability nor lack of controllability should be assumed until there has been a suitable period of time for observation. Patients requiring prolonged observation will ordinarily be followed on an outpatient status. The observation period will vary in length according to the type and frequency of seizures in the individual case. Where it is apparent that the member has not cooperated fully in the treatment program and it is the opinion of the medical officer that control has not been achieved by virtue of this lack of cooperation, the member may be considered medically fit and recommendation made for administrative disposition by reason of defective personality, defective attitude, or shirking, as the case may be. ‡ ‡ ‡
90. Encephalopathy. In determining the member’s fitness for retention on duty, encephalopathy is considered to be a clinical condition in which there is evidence of alteration of brain function in any of its several spheres such as intelligence, judgment, perception, behavior, motor control, sensory function, etc. The mere demonstration of circumscribed brain injury or disease does not of itself establish a clinical diagnosis of encephalopathy. Headache may accompany, but is not a primary symptom of encephalopathy since the brain substance is insensitive. Where post-traumatic symp-tomatology includes only headache or other subjective disturbances of this kind, a diagnosis other than encephalopathy may be indicated. A member in whom the diagnosis of encephalopathy has been established may be retained if the condition is mild, nonprogressive, and does not interfere with the performance of duties.
$ if: ‡ ‡ ‡
25. On August 1, 1958, less than 2 months after plaintiff was separated from the service as heretofore noted, he was given a physical examination at the Veterans Administration regional office at San Antonio, Texas, as a result of his application to that agency. He was given a special neuro-psychiatric examination.
The medical examiner noted that plaintiff then was 31 years of age, had poor vision in his left eye as a result of the injury in Korea, occasional headaches and numbness in the *177 left band, but otherwise no complaints, except that a small fragment just under the skin in his neck caused him to nick himself in shaving. Psychiatric review of plaintiff revealed no neurotic or abnormal personality traits. There was no evidence of disuse in the left arm or forearm and no findings of neurological nature of head or neck. Sites of fragments in the skull were negative. There were no cranial nerve defects. Psychiatrieally, plaintiff was found to have an adequate personality structure. The diagnosis was: “No N.P. or neurological disease found.”
The special eye examination accorded plaintiff by the Veterans Administration found “an operative aphakia, left eye, with acuity, count fingers 3 ft., corrected to 20/70, right eye vision 20/20.”
The Veterans Administration awarded plaintiff a 30 percent disability rating for his aphakia vision and 10 percent for scars, for a combined rating of 40 percent. No percentage rating of any kind was awarded for other alleged disabilities.
26. Plaintiff, represented by the American Legion, appealed to the Board of Veterans Appeals for an increased rating for aphakia, left eye, including a statutory award by reason of blindness in that eye, alleging light perception only.
On March 19, 1959, the board denied the appeal. In its statement the board pointed out that vision in the right eye was normal and that vision in the left or injured eye was correctable to 20/70 but that there was aphakia, residual of surgery for treatment of a traumatic cataract resulting from wounds, and visual acuity was limited to counting fingers at 3 feet. The board, however, stated:
The facts in this case have been considered in association with the contentions advanced on appeal, and cognizance has been taken of the doctrine of reasonable doubt. In this connection, the clinical and other findings have been evaluated under the schedular provisions for rating disabilities. It is the conclusion of the Board that the evidence does not show that aphakia, left eye, demonstrates disablement of sufficient severity as to warrant the assignment of a rating in excess of thirty per cent (30%). Neither does the evidence show that visual *178 acuity of the left eye is impaired to the extent establishing blindness of this eye, with light perception only, as provided by applicable regulations pertaining to special monthly compensation benefits.
The appeal is denied.
At the time of the trial in this court, plaintiff was employed as an insurance salesman in which employment he drove his automobile. His total driving averaged from 10,000 to 12,000 miles per year, Plaintiff does not wear glasses. His driver’s license is unrestricted.
27. Plaintiff offered the testimony of an expert witness, Dr. Wm. T. Spence, a neurological surgeon. Dr. Spence for over 4 years was Chief of the Neurological Section of the Navy and presently is Associate Professor of Neurological Surgery at Georgetown University, Chief of Neurosurgery at the Washington Hospital Center, and a consultant to the Veterans Administration, Public Health Service, and the National Institutes of Health. He examined plaintiff for an hour and a half on December 11, 1959, and briefly reviewed his medical records.
28. As a part of his examination by Dr. Spence, plaintiff was given an electro-encephalogram. Partially, as a result thereof, Dr. Spence was of the opinion that plaintiff had a brain lesion, secondary to the injury of metallic fragments, that the injury had caused a brain disorder in the form of traumatic epilepsy, and that the wounds had also disturbed plaintiff’s vision and at one time impaired his left arm. Dr. Spence admitted that the electro-encephalogram was a borderline one. Nevertheless, he felt that plaintiff’s history of momentary seizures confirmed his diagnosis. He would not midertake to define the amount of disability plaintiff suffered, but considered him unfit for active military service as a commanding officer with responsibility for the lives of subordinates. He considered plaintiff qualified for administrative duties.
On the basis of plaintiff’s efficiency reports, Dr. Spence thought that it was probable plaintiff had also suffered a personality change or defect. These reports showed that until 1955 plaintiff was a very good officer but declined substantially in efficiency thereafter. Dr. Spence was of the opinion that there was a latent possibility of plaintiff’s suf *179 fering an abscess in the area of retained fragments in bis body, especially in or near tbe brain.
29. Plaintiff’s expert witness confirmed tbe presence of foreign metallic bodies in and around plaintiff’s head by reference to the X-rays. He was of tbe opinion that damage to plaintiff’s left arm or hand would not keep plaintiff from active military duty. He did not make a complete eye examination. While the electro-encephalogram examination was described as essentially normal, the witness was of the overall impression, not attributable to any single thing, that plaintiff was unfit for active duty. He could not definitely say that there was a fragment in plaintiff’s brain, but was of the opinion that the fragments in the skull were either there or had passed through a portion of the brain at the left temporal lobe and that a personality change arising therefrom would not be uncommon. The fact that plaintiff performed efficiently in the military service for several years after his wounds were incurred would not detract from the evaluation of this witness, nor would the fact that the one occasion on which plaintiff suffered unconsciousness, which was not until January 2, 1958. In 1951 Dr. Spence would not have approved plaintiff for further military duty of other than an administrative nature.
30. Defendant presented the testimony of Lieutenant Colonel George J. Hayes as an expert witness. He is Chief of the Neurologic Service at Walter Reed Army Hospital. His qualifications were conceded. Dr. Hayes examined plaintiff’s medical records and the transcript of the testimony of Dr. Spence. He did not personally examine plaintiff. He did not qualify as an expert on the condition of plaintiff’s eyes. He did, however, offer it as his opinion that plaintiff did not fill the criteria for a diplopia binocular (double vision) and that plaintiff did qualify as fit for duty under the visual standards of AR 40-504, paragraph 6, which defines as fit for retention an officer with 20/20 vision in one eye and 20/400 in the other.
31. Dr. Hayes confirmed the existence of foreign metallic bodies in plaintiff’s head. The exact location of these he found difficult to establish from the record but was of the opinion that one was in the soft tissues of muscle adjacent *180 to the temporal bone behind the left eye and just in or just outside of the skull. He was reasonably sure that one piece was inside the skull and encased in scar tissue which walled it off from the rest of the brain. While admitting damage to the brain tissue he found no evidence of any abscess formation, past or present, and felt it medically improbable one would occur so long after an injury. He determined that the cranial nerves were intact and did not think that peripheral nerve injuries suffered by plaintiff or presence of foreign bodies in plaintiff’s head rendered him unfit for performance of military duty. Dr. Hayes found it significant that plaintiff had satisfactorily performed his military duties for several years after his injuries were incurred.
32. Dr. Hayes flatly disagreed with Dr. Spence’s evidence that a foreign object in plaintiff’s brain had caused an injury resulting in traumatic epilepsy. He said that the electro-encephalograms did not support existence of a seizure pattern but were essentially normal. In fact, Dr. Hayes could find no evidence whatever of epileptic seizures or convulsions, and pointed out that Dr. Spence had not observed any seizures, but based his opinion upon plaintiff’s references in the record as to their alleged existence. He described the types of behavior which go with such a condition and indicated that they did not exist in the record of the case. The fact that plaintiff suffered one fall over 7 years after his wound was received was not significant, absent other evidence.
33. Dr. Hayes, while not disputing that in December 1951 plaintiff was not qualified for field or combat duty, nevertheless was of the opinion that he was capable of such duty in 1958. He felt plaintiff qualified for field and combat duty at any place and under any circumstances, with the qualification that on account of the defect in his vision of the left eye, he should not be given duty involving estimates of range without optical instrumentation. But, even with this difficulty he felt there were places in a field outfit where plaintiff could be utilized.
34. Dr. Hayes admitted that a lesion of the temporal lobe could cause a personality defect. But, he felt with reasonable medical certainty that there had been no such defect *181 created as shown by the evidence in the case. The decline in the quality of plaintiff’s efficiency reports he attributed to the changing manpower requirements of the Army at the time and to directives to tighten up on marginal personnel. No personality disorder had been apparent to the examining medical officer at Fitzsimons Hospital in April 1958 nor to the Veterans Administration in August 1958. These examinations were referred to by Dr. Hayes to corroborate his own opinion.
35. Defendant called as an expert witness, Colonel Austin Lowrey, Jr., Chief of the Eye Clinic at Walter Need Army Hospital. Dr. Lowrey has been in the Army 31 years and doing ophthalmology for 27 of those years, 15 of them at Walter Need. He did not examine plaintiff but did examine plaintiff’s medical records and confirmed that plaintiff has aphakic vision in his left eye, i.e., vision without the lens of the eye, the same having been removed because it had catar-acted as a result of the battle injury received in Korea. The right eye was described by the witness as essentially normal. The witness was of the opinion that plaintiff’s complaints of diplopia, or double vision, from his left eye on occasion were not of any clinical significance. Defendant concedes that plaintiff had only vision capable of light perception in the injured eye at the time of plaintiff’s separation from the service although about a month afterwards the vision improved to 20/70.
36. Dr. Lowrey made reference to the “profile system” employed by the Army to classify and assign people coming on active duty. He said it was not used as a separation procedure. The regulations are in evidence. They confirm his statement. He noted that plaintiff was assigned an E-4 profile on April 2, 1958, by a medical board and declared fit for duty as noted in finding 16. The assignment of a profile E-4 with this conclusion was in error in his opinion, but was really irrelevant to the question of plaintiff’s retention on duty, except that it would have been helpful in assigning him duties. Plaintiff’s condition at the time of separation was equivalent, he indicated, to that of an E-3 profile which would have made him eligible for induction under AR 40-503. He was previously classified as E-3.
*182 The standard for retention, AR 40-504, in effect at the time of plaintiff’s separation from the service, is not described as a “profile.” The pertinent parts of this regulation have previously been set forth in finding 24. Under administrative interpretation thereof plaintiff was fit for retention at the time of his separation in June 1958 according to Ur. Lowrey. The standard for retention at that time, as administratively interpreted, allowed only light perception in one eye if the other was corrected to 20/40 or better. Plaintiff’s good right eye had 20/20 vision.
37. Although qualified for retention under Dr. Lowrey’s and defendant’s interpretation of the regulations, plaintiff would not have been eligible for assignment to a combat unit. Under policy effective at the time, it was necessary to have a profile of E-l or E-2 for combat duty. Dr. Lowrey contended, however, that the profiles were liberally interpreted when applied to people already in the military service depending to some extent on a man’s value to his unit and upon his efficiency reports. Dr. Lowery considered that there were duties in the rear which a man with a left eye such as plaintiff’s could do satisfactorily, but did not think he could perform the duties of a captain of artillery; further, that it was the policy of the Army not to assign anyone with vision in only one eye to duty where there was danger to the other eye. In brief, plaintiff was described by Dr. Lowrey as a “limited service officer.”
38. The weight of the evidence in this case establishes that at the time of his separation from the Army on June 9,1958, pursuant to special order No. 121, dated June 3, 1958, by reason of an authorized reduction of Army strength, and not for disability, plaintiff met the standards set forth in Army regulations both for induction and retention on active duty. At this time, however, plaintiff was suffering from the loss of vision, except for light perception, in his left eye due to a combat-incurred injury. Because of this defect in his sight he was only a limited duty officer who could no longer have commanded as an artillery captain in combat or under field conditions. It was not the policy of the Army to assign an officer with such a handicap to combat duty, and after his injury plaintiff no longer was given assignments *183 such as lie bad prior thereto. He was qualified for administrative duties. The evidence does not support any findings that plaintiff suffered any continuing disabilities, other than to his vision, and which disabilities rendered him unfit for retention in the military service.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.