Dtjefee, Judge,
delivered the opinion of the court:
This is an action for disability retirement benefits under Section 402(a) of the Career Compensation Act of 1949, 63 Stat. 802, 816-17, 37 U.S.C., § 272(a) (1952), as amended, 10 U.S.C. §§ 1201 et. seq. (1958). The question to be resolved is whether or not the decision of the Air Force Board for Correction of Military Becords denying plaintiff’s application for a disability retirement rating was arbitrary, capricious, unsupported by evidence, or contrary to the laws and regulations relating to disability retirement. These are the set boundaries within which this court will review such Board action. Thompson v. United States, 156 Ct. Cl. 158 (1962).
Plaintiff’s trouble began in the latter part of October, 1955 when he was hospitalized for high blood pressure at a United States Air Force Hospital in Germany. Prior to that time he had served as a pilot in World War II, and then later in the. Korean campaign. At the time of his hospitalization plaintiff had attained the rank of a captain and had served on active duty for approximately nine years.
The clinical records covering the period plaintiff was hospitalized in Germany from October 31, 1955, to November 4, 1955, disclose that on entry his face was flushed, and *519 bis blood pressure was 154/104- Plaintiff was given a complete hypertensive workup. Doctor’s progress notes show that subsequent to the examination of plaintiff at the time he entered the hospital his blood pressure fell to normal limits. He was discharged with a final diagnosis of “Hypertensive cardiovascular disease, benign.” Plaintiff returned to flying duty about three months after his release.
Plaintiff next entered a hospital in June 1957 in Morocco, and remained there for 35 days for treatment of a severe arthritic condition of the knee. At the time of entry his blood pressure was 130/90.
In August, 1958 plaintiff was returned to the United States, as he was scheduled for release from active duty on August 31,1958, under a reduction in force program. Plaintiff was examined by Captain Neil H. Newsom at Norton Air Force Base on August 26, 1958. Plaintiff stated that he had been hospitalized in Germany and Morocco, but the records do not show that he particularized the disabilities for which he was hospitalized. A report of medical examination submitted by Captain Newsom disclosed that plaintiff’s blood pressure reading was 158/98. The examination and medical history report bore the following notation, “Patient presents elevation of blood pressure * * * which has never been clinically evaluated.” Plaintiff was then referred to the orthopedic clinic for further evaluation.
The examination report by the orthopedic clinic showed five defects in plaintiff’s condition. These were a chalazion of the right eyelid; arthritis of the right knee; Dupuytren’s contracture of the right hand and foot; superficial scars, and an undetermined hypertensive vascular disease that was manifested by high blood pressure and albuminemia. The recommendation portion of the report read, “Advised to have albuminemia and elevation of blood pressure evaluated thru Veterans Administration.”
Plaintiff’s case was then referred to a Medical Board at Norton Air Force Base. After examining plaintiff and considering his case, the Medical Board Beport showed the Dupuytren’s contracture, the arthritis, and suspected hypertension with a diagnosis not established. The Board recommended transfer to another facility for further observa *520 tion and for a possible bearing before the Physical Evaluation Board.
Plaintiff was then sent to a hospital at LacHand Air Force Base in Texas. He was hospitalized for a four-day period at which time the doctors were informed of his prior hospitalization in Germany for hypertension. They also had the Medical Board’s diagnosis of suspected hypertension. Upon entry, plaintiff had a blood pressure reading of 170/ 115 under circumstances not shown. There was no diagnosis, made at Lackland in respect to the hypertension. It further appears from the record that plaintiff did not have a complete hypertension workup. Plaintiff then returned to Norton Air Force Base.
At Norton plaintiff was told by Captain Newsom that his status relating to disability would be based upon the degree of disability he had under the Veterans Administration Schedule for Bating Disabilities, and suggested plaintiff be examined by them. He was told by the non-commissioned officer in charge of the Administrative Section of the hospital at Norton that his record would be reviewed after the Veterans Administration had made its report. Plaintiff was then discharged on October 18, 1958, and thereafter made application to the Veterans Administration for disability compensation.
On November 21, 1958 plaintiff was given a physical examination by the Veterans Administration. A medical report of the examination includes pertinent notations, some of which are as follows:
Head, Face, and Neck: Flush to Face, severe
‡ ‡ ‡

Cardiovascular System:

Applicant has been hospitalized (1954 — 1955) for hypertension — Is experiencing frequent epistaxis, headaches and some dizziness and currently is under treatment for hypertension by a private MD. He has had numbness down inner aspect of rt. arm for past 18 months — “constantly asleep.” No precordial pain or palpitation have been noted but has exertional dyspnea.
Current Ex — Anti-hypertensive Bx (?)

*521
Blood, Pressure:

Sitting__S 196-D 118
Sitting after exercise_S 212-D 112
2 Min. after exercise-S 200-D 118
H* »!* $
The physician’s diagnosis consisted of the following: Diagnosis:
1. Hypertension — arteriosclerotic Ht. disease and sinus tachycardia.
2. Normal eye examination (see specialist’s report).
3. Arthritis, rt. knee (clinically) — not shown on X-ray.
4. Dupuytren’s Contracture, rt. hand and foot.
On January 22, 1959, the Veterans Administration rated plaintiff 30 percent disabled as a result of arteriosclerotic heart disease. The other maladies did not contribute to the 30 percent rating. The report stated that the “* * * VA examination makes a diagnosis of hypertensive arterioscle-rotic heart disease with a reading of 196/118 with normal urinalysis. * * *”[1]
After plaintiff received notification from the Veterans Administration of the 30 percent rating, he returned to Norton Air Force Base and learned that both Captain New-som and the non-commissioned officer in charge of the Administrative Section of the hospital had been transferred. Plaintiff was referred to a legal officer at Norton who told plaintiff the only thing he could do was to advise plaintiff to file an application with the Air Force Board for Correction of Military Becords. It is reasonably clear from the evidence that plaintiff went to the Veterans Administration for a physical examination under the impression that the report and evaluation of the Veterans Administration would be reviewed by appropriate officials of the Air Force for the purpose of determining his eligibility for disability retirement.
On February 18,1959, plaintiff submitted to the Air Force Board for Correction of Military Becords an application requesting that his military records be corrected so that he might receive physical disability retirement. The Board *522 for Correction referred tbe matter for consideration. On August 5,1959, the Office of the Surgeon General sent a memorandum-opinion of plaintiff’s case to the Board for Correction. The opinion stated that plaintiff’s “* * * defects in question had been adequately studied prior to separation. * * *” The opinion concluded that “It is the opinion of the Surgeon General that the applicant was properly evaluated prior to his separation, that he was not unfit for further military service at that time, and that an alteration of the record is not justified.”
On the basis of the Memorandum-opinion by the Surgeon General, the Air Force Board for Correction of Military Eecords denied plaintiff’s application without a hearing on January 11, 1980. Plaintiff then requested the Board to reconsider, and on June 7,1960, the Board denied the request by letter to plaintiff. The letter of denial stated in pertinent part :
* * * The Air Force Surgeon General has reviewed the medical aspects of your case and has advised the Board that in his opinion there were no defects noted in either the service hospital clinical records or the separation physical examination which would have warranted appearance before a Physical Evaluation Board and that the defects in question had teen adequately studied frior to separation. * * *” [Emphasis supplied.]
Plaintiff testified at trial that since his separation from the service his condition has worsened, and as a result of his hypertension he has been unable to obtain employment. We have found no reasons to disbelieve plaintiff’s assertions.
Plaintiff now contends that the action of the Correction Board in refusing to correct his records to show a service connected disability was arbitrary, capricious and erroneous and not supported by substantial evidence. We have reached the same conclusion.
The Correction Board was under no duty to defer to the conclusion reached by the Veterans Administration if there was substantial evidence before the Board to the contrary. John M. Kearney v. United States, 140 Ct. Cl. 523, 525-26, 156 F. Supp. 928, 930 (1957), cert. denied, 360 U.S. 916 (1959). While the Veterans Administration’s determina- *523 of tlie degree of disability are not conclusive upon this court, John Stewart Andrews, Executor et al. v. United States, 163 Ct. Cl. 126, 131-132 (1963), we do believe that the results of the medical examination given by the Veterans Administration only one month after plaintiff’s discharge are entitled to considerable weight in our review of the Correction Board’s action, especially in view of the failure of the Air Force to adequately evaluate plaintiff’s condition of hypertension. The examination by the Veter ans Administration showed plaintiff to have extremely high blood pressure. When plaintiff was merely sitting, the reading was 196/118.
At trial, one of plaintiff’s expert witnesses, Dr. Cerini, a well qualified private practitioner specializing in cardiology, stated that normal blood pressure for a man plaintiff’s age should be somewhere under 150 systolic and 90 diastolic. (Yet only one month after discharge plaintiff’s reading was 196/118.)
Dr. Cerini further testified that on September 25, 1958, when plaintiff was still in the service, and about one month before his discharge, he had taken plaintiff’s blood pressure and found that it ran as high as 164 to 198 systolic and 116 to 138 diastolic. Dr. Cerini expressed the opinion that the presence of albumen in the urine in the report of the medical examination at Norton showed hypertension, and that the kidneys were probably the source of the condition. He further stated that he liked to see extensive tests done when such a condition is suspected.
Another expert physician testified that considering plaintiff’s medical history and records, including the reports of the medical examinations made of plaintiff at Norton and Lackland, an adequate study was not made of the hypertension condition at Norton or Lackland. He stated that at Lackland plaintiff did not receive “a medical workup which included specific attention to hypertension or high blood pressure.”
The third expert, the Veterans Administration doctor who examined plaintiff, stated that the blood pressure readings of plaintiff were abnormally high for a man of his age.
There is language in our opinion in Furlong v. United States, 153 Ct. Cl. 557, 566 (1961) that the admissibility of *524 such, expert testimony is doubtful. However, the evidence sought to be admitted in Furlong, supra,[2] consisted of the testimony of certain doctors who gave their opinions of what plaintiff's condition had been thirteen years before the date of their examination of him. In this case, the testimony consists of reports of physical examinations contemporaneous with the time of discharge, and opinion relating to the proper evaluation of plaintiff’s blood pressure.
It is highly significant that defendant introduced no witnesses with the comparable expertise of plaintiff’s witnesses, and in no way refuted their testimony. We feel, therefore, disposed to accept the conclusions made by plaintiff’s experts. Applying these conclusions to the facts of the case, we believe that the report of medical examination .at Norton in August, 1958 when plaintiff’s blood pressure reading was 158/98 should have put defendant’s physicians on notice that plaintiff might be subject to hypertension. Plaintiff then and there should have been afforded a full hypertension workup. In any event, once the Medical Board Report showed suspected hypertension, and plaintiff was sent to Lackland and he showed a blood pressure reading of 170/115 at Lackland, then certainly a complete hypertension workup should have been given. When plaintiff returned to Norton, he was still not given the full tests for hypertension.[3] Yet plaintiff certainly had not been miraculously cured of this defect at that time. Dr. Cerini’s examination on September 25, 1958, showed very high blood pressure readings, and the Veterans Administration physical only one month after discharge showed a reading of 196/118.
Our conclusion that plaintiff’s condition showed enough of a suspected hypertension that he should have been given a complete examination with the attendant tests for hypertension is 180 degrees out of phase with the language in the opinion of the Surgeon General that “* * * The defects in *525 question had been adequately studied prior to separation. * * *” That statement was the basis for the Surgeon General’s conclusion that plaintiff was properly evaluated prior to separation. The Surgeon General’s conclusion in turn formed the basis for the Correction Board’s denial of plaintiff’s request for correction of records to show a disability.
This court has stated that the Correction Board is arbi-tary when it follows an ex parte opinion of the Surgeon General which is inaccurate and contrary to the evidence. Suter v. United States, 139 Ct. Cl. 466, 471, 153 F. Supp. 367, 369 (1957); Weiner v. United States, 148 Ct. Cl. 445, 454 (1960). We so hold here. The Surgeon General’s opinion was inaccurate. Plaintiff’s defects had not been studied adequately prior to separation. The Correction Board, in following this inaccurate ex parte opinion was arbitrary and capricious. Plaintiff is therefore entitled to recover disability retirement pay.
Our Trial Commissioner has found, and we agree, that the disability rating of 30 percent given by the Veterans Administration is conservative, reasonable and justified. Since plaintiff has asked for no more than a 30 percent disability rating under the Career Compensation Act, we see no valid reason for remanding the case in order to determine the percent of disability.
Accordingly, plaintiff is entitled to recover disability retirement pay for a person 30 percent disabled from the date of his release from active duty on October 18, 1958 to date of judgment, less disability compensation received from the Veterans Administration. The amount of recovery will be determined pursuant to Rule 47 (c) of the rules of this court.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff enlisted in the Regular Army April 26, 1941, trained as a pilot and was discharged on December 11,1941, by reason of completion of his training. On December 12, 1941, he accepted appointment as a second lieutenant in the Air Reserve and served on active duty as a fighter pilot from *526 that date until January 29,1946, when he was released from active duty as a captain. During this period of active duty, plaintiff served as a combat fighter pilot and received six bronze stars as a result of participating in the following battles and engagements: Air Offensive Europe, Normandy, Northern France, Germany, Ardennes, and Central Europe.
2. (a) Plaintiff was recalled to active duty on October 9, 1950, and served as a captain in the U.S. Air Force until October 17,1958, when he was released in the grade of major under the provisions of Section 681, Title 10, U.S. Code (not by reason of physical disability). During this period of active duty, plaintiff served in all of the campaigns in Korea in the year 1951, and in Europe and North Africa during the period 1953-1958. Plaintiff continued as a major in the Air Force Eeserve from the time of his release on October 17, 1958, until December 8, 1959, when he was placed on the United States Air Force Eetired List, without retirement pay, under the provisions of paragraph 4(j) (2), AE 45-39, not by reason of physical disability.
(b) Plaintiff was officially on flying status from October 9, 1950, until sometime in February 1956, when such status was terminated by reason of reduction and not because of his physical condition. On October 31, 1955, while stationed in Germany, following an annual examination about a week before which disclosed a blood pressure reading of 154/104, plaintiff was sent to the 7330th USAF Hospital at Fursten-feld Bruck, Germany, where he remained until November 4, 1955, when he was discharged to duty. After his release from the hospital, plaintiff did not do any flying for about three months and thereafter did some flying.
(c) Plaintiff was taken off flying status in February 1956; thereafter, he was assigned to administrative duties as commander of an airway and air communications squadron with a complement of about 68 men and he performed such duty until his release from active duty on October 17,1958. His duties consisted of regular army office work and management of personnel, with the normal worry associated with duty of this nature.
3. During the course of physical examinations of plaintiff prior to 1955, he was found qualified for appointment as an *527 duty, with blood pressure readings of 114/78 on October 21, 1941; 124/80 on October 21, 1945; 140/80 on July 17, 1950; 120/76 on October 9, 1950; and 126/88 on October 9,1952.[1]
4. (a) The clinical records covering the period plaintiff was hospitalized at Furstenfeld Bruck, Germany, from October 31, 1955, to November 4,1955, disclose that on entry his face was flushed and his blood pressure was 154/140. Plaintiff was given a complete hypertensive workup. Plaintiff’s medical history reflects, among other things, that he “has been smoking 18 years now using iy2 packs/day;” that he had “no fainting spells, or blurring vision, no visual disturbances. No dyspnea or palpitation, no edema or chest pain. Denies any cough or respiratory or cardiac difficulty.” He stated that he had “occasional nose bleeds.”
(b) An electrocardiographic report dated October 81,1955, contains a notation “normal tracing”. A chest examination report dated November 1, 1955, reads as follows:
Heart appears to be within normal limits. Lung fields reveal no significant abnormality except a slight prominence of the bronchovascular markings left upperfield. Follow-up in 3 months is suggested.
There is no evidence that a follow-up was made within the suggested period of three months. Doctor’s progress notes show that subsequent to the examination made of plaintiff at the time he entered the hospital, his blood pressure fell to normal limits with readings of 136/90-84, and 150/100 after smoking a cigarette on October 31; 118/80 on November 1; and 110/80 on November 2-3,1955.
(c) A physical examination report contains entries that the physiologic cuppings of the disc were “normal”, but that the arterioles were “narrower” and that the right disc “has small area of hemorrhage (punctate).” At the end of the report, the examining physician recorded an “Initial Impression'’ of “(1) Essential Hypertension with grade iii Et. disc”, and “ (2) Dupuytren’s contracture of left little finger.” (Emphasis supplied.)
*528 A note recorded on reads as follows:
Pt. is almost finished with workup. All tests thus far have been within normal limits — PSP, NPN, chest x-ray and ECGr. Tests for pheochromocytoma are unavailable.
As noted above, sleeping BP is normal. This pt. has a very labile BP as nicotine causes in immediate significant elevation. Same result occurs with excitement of the slightest kind.
He is to be observed for another day or so; battery of eye tests will be done, and then pt. will be discharged.
Another note recorded by the same person on the following day reads in pertinent part:
Workup completed-no abnormalities detected. BP has fallen to within normal limits since hospitalization. Eye workup today reveals no abnormality:
‡ ‡ ‡ ‡ $
Pt. to- be discharged tomorrow and placed back on Flying Status.
Plaintiff was discharged on November 4,1955, with a final diagnosis of “Hypertensive cardiovascular disease, benign.”
5. (a) Plaintiff entered the 7280th TJ.S. Air Force Hospital in Nouasser, Morocco (French), on June4,1957, following an onset of pain in his right knee, and he was discharged on July 9, 1957. The clinical records covering the 85-day period of plaintiff’s hospitalization disclose that plaintiff was admitted to the hospital in a wheel chair and at the time of his admittance his blood pressure was 130/90; and that although his whole right leg was swollen, the right knee, particularly, showed signs of “inflammation and effusion.” Plaintiff complained of pain and was given morphine, codeine, and demerol on various occasions and his right leg was placed in traction. In violation of doctor’s orders, plaintiff removed traction on at least two occasions and was observed walking despite specific instructions not to do so.
(b) A radiographic report, dated June 4, 1957, reads in pertinent part:
Films of the right knee show no evidence of fracture, arthritis, loose body, or other abnormality.
*529 (c) The medical records contain the following notation: “4 June 57 — 748 — Puncture for aspiration of joint, right knee joint. Anesthesia: 1% procaine, local, infiltration.”; and a narrative summary of the records reads in pertinent part:
íjí $ $ $ $
Physical examination on admission revealed an exquisitely tender right knee over the patella ligament with definite patellar ballottment. Diffuse subsiding far-uncles over the chest and back, none of these in the acute stage.
Hospital cowse: Patient continued to develop a frankly septic right knee, which seemed to respond quite well to aspiration with the instillation of penicillin and streptomycin. Multiple aspirations of the knee followed with instillation of antibiotics. About the fifth or sixth day of hospitalization patient developed a dermatitis which was felt to be a sensitivity to penicillin. Thereafter the knee effusion seemed to markedly increase. Use of penicillin was ceased and in its place aureomycin was used both systemically and for irrigation of the involved knee. A marked change in the previously neu-trophilic knee joint fluid to fluid containing a large percentage of eosinophils was found. The patient gradually continued to reabsorb the knee fluid and was fully ambulatory without evidence of knee effusion upon discharge.
‡ ‡ ‡ ‡ $
(d) The final diagnosis of plaintiff’s case was “arthritis due to infection, right knee joint, acute, organism undetermined.”
6. (a) In August 1958, plaintiff was returned to the United States, as he was scheduled for release from active duty on August 31,1958, under a reduction-in-force program. He was ordered to the USAF Hospital at Norton Air Force Base (AFB), San Bernardino, California, for a separation examination in connection with final processing preliminary to release from active duty. Plaintiff was examined by Captain Neil H. Newsom on August 26, 1958, and the report of medical history reflects that plaintiff stated his then present health as “Arthritis. Hospitalized for 35 days with swollen knee, knee and foot still give trouble when walking or prolonged standing. Severe penicillin reaction. Still have ef *530 fects.” Plaintiff indicated that he either had in the past or then had, among other things, swollen or painful joints, abnormal blood pressure, cramps in his legs, reaction to “serum, drug or medicine”, arthritis or rheumatism, lameness and foot trouble. Plaintiff stated that he had been hospitalized in Germany and Morocco, but the records do not show that he advised the nature of the particular physical disability for which he was hospitalized. Plaintiff indicated that he intended “to apply for disability for arthritis 30 %” and an “inability at times to do fine work.” Both the medical history and the examination report bear the following notations:
Patient presents elevation of blood pressure and 1+ albu-minemia which has never been clinically evaluated, duration and etiology undetermined. Hospitalized 1957, for 35 days for non-specific arthritis right knee. Now complains of occasional swelling and dull aching pain of right knee on prolonged standing or walking. Penicillin reaction; June 1957, with residual superficial scars of back and shoulder.
(b) A urinalysis showed specific gravity of 1.017; albumin 1+ ; sugar, negative; microscopic 8-10 WBC; a chest x-ray was negative; and cardiolipin negative. An electrocardio-graphic record is summarized in the following words: “Normal tracing; poor contact made with electrode to chest lead; V4, Y5, V6.”
(c) A report of medical examination submitted by Captain Newsom discloses that plaintiff’s blood pressure reading was 158/98; that his pulse was 80 (sitting), 120 (immediately after exercise), and 88 (two minutes after exercise). Plaintiff was inferred to the orthopedic clinic with a “Bequest” for “evaluation, prior to separation”, which request, in addition to reciting the substance of the history set forth in (a), supra, states “Physical exam at present is negative except for y2 inch atrophy of right thigh musculative”. The examination report covering the examination made of plaintiff in the orthopedic clinic reads, in legible part, as follows:
Dupuytren’s contracture right palm and right sole.
*531 Must meet M.E.B. [Medical Examination Board]
(d) A summary of defects and diagnoses, together with supplementary details appearing in another part of the medical report (which details are set forth in brackets) submitted by the examining physician, reads as follows:
Item 18. Chalazion, lower lid, right eye.
Item 37. Chondromalacia, right knee due to septic arthritis, 1957. (No evidence of swelling, effusion, or increased redness of right knee. Full range of motion without abnormal ligamentous relaxation. No evidence of motor weakness. inch of right thigh musculative.)
Item 38. Dupuytren’s contracture, right hand, right foot. (Contracture, Dupuytren’s Plantar fascia right foot, palmar fascia right hand.)
(Item 39. Scattered, small, erythematous, superficial scars of back and shoulders as residual of penicillin reaction, 1957. NSND)
Item 73. Hypertensive vascular disease, type undetermined, manifest by elevation of blood pressure and albuminemia.
(e) The recommendation portion of the report reads “Advised to have albuminemia and elevation of blood pressure evaluated thru Veteran’s Administration.”
7. On or about August 28, 1958, in response to a telegram from USAF Headquarters in Washington, D.C., apparently inquiring relative to plaintiff’s separation, the San Bernar-dino Air Materiel Area (SBAMA), Norton AFB, sent a telegram to headquarters in Washington, D.C., which reads in pertinent part:
***MAJOR ERANK A. HUTTER A0431453 REPORTED THIS HQ 22 AUG 58. PHYSICAL WAS SCHEDULED FOR 26 AUG 58. EVERY EFFORT WAS MADE TO COMPLY WITH ESTABLISHED RELEASE DATE OF 31 AUG 58; HOWEVER, ORTHOPEDIC CONSULTATION IS REQUIRED BY THE HOSPITAL BEFORE OFFICER CAN BE RELEASED MAKING IT IMPOSSIBLE TO COMPLY WITH THE ABOVE DATE. OFFICER WILL BE RELEASED AT THE EARLIEST POSSIBLE DATE AFTER RECEIPT OF MEDICAL REPORT AND YOUR HQ WILL BE NOTIFIED AS TO NEW DATE OF SEPARATION.
*532 8. Plaintiff’s case was referred to a Medical Board at Norton AFB. Tbe Board, comprised of Captain Newsom who bad examined plaintiff on August 26, 1958, another medical captain and a civilian physician, examined plaintiff and considered his case on September 5, 1958. A Medical Board Report, which was approved by the appointing authority on September 8, 1958, reflects that the Board diagnosed plaintiff’s condition as follows :
1. Dupuytren’s contracture of right hand and right foot.
2. Chondromalacia, right knee — Residual of septic arthritis of right knee in 1957.
3. Observation medical for suspected hypertension, minimal. Diagnosis not established.
The report states that “patient has received maximum treatment at this facility” and the following recommendation was made: “Transfer to another medical facility for possible PEB. For further observation and treatment.”
9. (a) On September 6, 1958, plaintiff was ordered to proceed in in-patient status on or about September 12, 1958, to the USAF Hospital at Lackland AFB, Texas, on temporary duty for a period not to exceed ninety days, for further observation and treatment. Plaintiff was hospitalized at Lackland from September 12,1958 until September 16,1958, when he was returned to duty at Norton AFB. The records covering the period plaintiff was in the hospital at Lackland disclose that he was “admitted from Norton Air Force Base to meet P.E.B. Board” and that under the heading “Complaints” the following “Problems” were noted:
1. Dupuytren right hand and right foot — 2 yrs.
2. Arthritic right knee — 2 yrs.
3. Atrophy muscles right thigh.
4. Hypertension — 5 yrs.
(b) On the basis of information furnished by plaintiff, the examining physician recorded the following information under the heading “History of Present Illnesses” (Part I):
Patient states that for past l%-2 yrs he has noticed gradual onset of tender hard fibrous bands in palm of right hand and sole of right foot. It has been pro *533 gressive. Pain and discomfort is aggravated by increased activity of the part. No history of trauma or severe injury to these parts. He has received no treatment for this condition at present time.
Patient states that he noticed no pain, swelling or discomfort with his right knee until three years ago. He noticed gradual onset of aching pain in his right knee. This was intermittent.
About a year he noticed onset of more severe pain in his right knee and swelling. He was admittea to the hospital in French Morocco for 35 days 4 June 57. During his stay there his knee was aspirated multiple tensor. Penicillin was injected intra-ostealarly, also cortison. Had allergic reaction to penicillin.
Swelling finally went down and he went back to duty. Had mild discomfort. No marked swelling since that time.
Patient states that at medical board atrophy of right thigh muscles was noted and diagnosis of chondro-malacia of right knee due to septic arthritis of same joint was diagnosed.
Mild hypertension first noted about 5 yrs ago. Was hospitalized in Germany and apparently no conclusions were drawn. At medical board diagnosis was not confirmed but listed as minimal or questionable.
Under the heading “System Review” (Part 3), the following notations appear:
Fair general health; denies frequent headaches, pain, swelling, stiffness, dyspepsia, chest pain, hemoptysis, or serious respiratory infection, ankle swelling, vomiting, diarrhea, bleeding tendency and swollen glands.
See HPI [History of Present Illnesses] — Has rapid pulse 90/min. Hypertension known 5 yrs 170/115; albumin in urine Aug. 58 and wbc [white blood cells] 10-12. Right arm goes to sleep frequently no relationship to position.
(c) A report of physical examination discloses that plaintiff was examined on September 12, 1958, at which time a blood pressure reading of 170/115 was recorded under circumstances not shown, i.e., whether it was taken while sitting, lying down, or before or after exercise. A notation relating to “cardiovascular” does not indicate any irregularity or *534 abnormality. A notation, relating to “Extremities” reads, in legible part:
Eight palm — . . . thickening lateral aspect of palm. 4-5th finger hand tend to flex at rest. Full rom * * * * ' #
Eight knee — full rom
No tenderness or eruption.
. . . atrophy thigh muscle on right.
The report does not disclose a pulse reading nor that any other tests were taken. The examining physician recorded his “Impression” as follows:
Dupuytren’s contracture right palm right sole
(d) The clinical records reflect that a notation was made on September 15, 1958, which reads “Seen on grand rounds. It is felt that he requires no Ex for dupuytren’s contracture. No incapacity.” The clinical record coyer sheet discloses the following final diagnosis:
omit Dg 1 XVIIIxy Not concurred in; replaced by Eg #4.
Dg 2 7320 Chondromalacia, right patellar, due to septic arthritis of right knee in 1957. LD: Yes
omit Dg 3 7932 Not concurred in.
Dg 4 7439 Contracture of fascia, Dupuy-trens type, right hand and foot, cause undetermined. LD: Yes
As best it can be determined from the examination report, diagnosis “1”, aboye, refers to Problem 1, set forth in finding 9(a), supra, (dupuytren right hand and right foot— 2 yrs); diagnosis “3” refers to Problem 3, ibid, (atrophy muscles right thigh). It does not appear that a diagnosis was made with respect to Problem 4, ibid, (hypertension— 5 yrs).
(e) The medical records reflect that the major portion of the examination made of plaintiff at Lackland related to his orthopedic complaints. The records do not disclose that plaintiff had a complete hypertension workup. The *535 physical examination report contains a notation relating to “Cardiovascular” which reads: “Regular rhythm, no (murmur) not enlarged”. While the medical records covering the physical examination of plaintiff at Norton contain references to his being hospitalized in Germany in 1955 and disclose that he gave a history of “hypertension — 5 yrs”, there is no evidence that the consulting physicians at either Lackland or Norton saw any records relating to plaintiff’s hospitalization in Germany in October-November 1955, or knew of the findings and diagnoses made during such period of hospitalization.[2]
10. (a) After plaintiff was discharged from the Lack-land AFB Hospital on September 16, 1958, he returned to Norton AFB where he was held pending receipt of medical records relating to his hospitalization at Lackland. Plaintiff was informed by Captain Newsom, who had examined him on August 6,1958, and a non-commissioned officer (name unknown) in charge (hereinafter referred to as the NCOIC) of the Administrative Section of the hospital at Norton AFB that since plaintiff had not received an evaluation at Norton, he might be sent to Fairchild AFB, California, for an evaluation, after the medical records arrived from Lackland. Apparently, Norton experienced some difficulty in obtaining the medical records from Lackland. The evidence does not disclose whether the records were ever received at Norton prior to the time plaintiff was released from active duty on October 18, 1958. Plaintiff was never sent to Fairchild AFB or any other Air Force hospital for an evaluation prior to his separation. It appears that Norton was under some pressure from Headquarters in Washington, D.C., to release plaintiff in accordance with his originally scheduled separation on August 31,1958.
(b) About a week or one and a half weeks later, plaintiff had another discussion with Captain Newsom and the NCOIC (mentioned in (a), supra) at Norton AFB. They informed plaintiff to the effect that his status would be based upon the degree of disability he had under the Veterans *536 Administration 'Schedule for Eating Disabilities[3] and suggested that since there was a Veterans Administration installation at Los Angeles, plaintiff could proceed there for an evaluation. In accordance with the foregoing advice and suggestion, plaintiff, on or about October 15, 1958, went to the Veterans Administration in Los Angeles where he was advised that he could not be scheduled for an evaluation •until after his separation from the Air Force. Thereafter, plaintiff returned to Norton and informed the NCOIC of the information that had been given to him at the Veterans Administration; whereupon, the NCOIC stated, “Well, when the Veterans Administration has your findings, bring them back and we will review them.” Thereafter, on October 18, 1958, plaintiff was released from active duty and separated from the Air Force.
11. (a) On October 23,1958, plaintiff made an application to the Veterans Administration for disability compensation. Thereafter, on November 21, 1958, plaintiff was given a physical examination at the Veterans Administration Ee-gional Office, Los Angeles, California. The Eeport of Medical Examination for Disability Evaluation, dated November 21, 1958,[4] reflects that plaintiff stated his then present complaint to be “high blood pressure. Eight arm gets numb. Dupuytren’s contracture of right hand and right foot. Arthritis in right knee.”
*537 (b) An electrocardiographic record bears the following summary: “Sinus tachycardia otherwise normal.” The following pertinent notations appear on a radiographic report:
eight KNEE (ap & lateral yiews) : There is no roentgen evidence of bone or articular pathology.
chest (pa view) : Lung fields and pleural margins are essentially clear. Cardiovascular silhouette appears normal.
IMPRESSION: THERE IS NO ROENTGEN EVIDENCE OP PULMONARY OR CARDIAC PATHOLOGY.
(c) A report of an eye examination reads as follows :
history :
He had a chalazion removed from the lower eyelid in the right eye, had recurred several times and he claims that he has dissolved it with heat and pressure. This was original and service-connected. Also he has a hypertensive vascular disease of undetermined origin according to his records.
examination :
Eye examination revealed the visual acuity in the right to be 20/20 and the left the same. Sees the Jaeger #1 Chart at 15 and 20" well with a+125 sphere. The fundi were normal. No hypertensive retinopathy was seen that was any significance, no hemorrhages, etc. No changes in the vessels. He had no recurrence of this chalazion either.
DIAGNOSIS : NORMAL EYE EXAMINATION.
(d) A medical report covering plaintiff’s physical examination, signed by Doctor John G. Moss, the examining physician, on December 4,1958, and approved by the reviewing officer on December 5, 1958, includes pertinent notations appearing under headings which are underlined below:
*****
Head,, Face, and Neels: Flush to face, severe.
*****

Cardiovascular System:

Applicant has been hospitalized (1954 — 1955) for hypertension — Is experiencing frequent epistaxis, headaches and some dizziness and currently is under treatment for hypertension by a private MD. He has had numbness down inner aspect of rt. arm for past 18 *538 months-'constantly asleep'. No precordial pain or palpitation have been noted but has exertional dyspnea. Current Rw-Anti-hypertensive Rx (?)

Ewam-

No cyanosis, dyspnea or venous engorgement. No enlargement of heart to percussion. Tones are forceful and regular but rapid. No thrills or murmurs are elicited. Peripheral vessels are slightly thickened. No pedal edema-peripheral pulses are equal and elastic.

Pulse:

Sitting98 Sitting after exercise114 2 Mm. after exercise98 Blood Pressure: SittingS

196-D 118

Sitting after exerciseS 212-D 112 2 Mm. after exerciseS 200-D 118 Respiration: Sitting17 Sitting after exercise30 2

Mm. after exercise18 Respiratory System: Normal. Digestive System: Normal. Genito-Urinary System: Normal-History

of Albumi- nenia.

Museulo-Sleeletal System: Applicant

developed arthritis in rt. knee when

sta- tioned

in No. Africa. Excessive walking and cold, damp weather accentuates the knee distress. He was hospi- talized for 35 days in Casablanca, No. Africa in 1957 and rt. leg in traction for 25 days.

Current Rx-None

About 2 yrs. ago he noticed contraction sensation inpalm of rt. hand and one year ago the same symptoms in rt. foot-plantar surface. Current Rw-Surgery later. Ewam~-There is no deformity or swelling of the rt. knee at present. Flexion and extension are full and painless. Squatting however is difficult and painful and hard to maintain. There is slight crepitus on motion. Slight atrophy of hamstrings and gastrocnemius muscles, rt. is noted. atrophy of hamstrings and gastrocnemius muscles rt. is noted.

*539
Measurements:

Left knee 13" Rt. knee 13"
Left thigh 21" Rt. thigh 20"
Left calf 13" Rt. calf 12
Bt. hand: A moderate Dupuytren’s contracture is present in the rt. palm — 1th metacarpal area — tender to pressure. Fist closure is complete and grip is same as m left hand. Pains in golfing, tennis, driving, etc.
Bt. foot: On the medial-plantar surface of the rt. foot there is a tense contracture. No muscle atrophy. Standing on toes is painless. Some tenderness on pressure over this area.

Urinalysis:

Specific Gravity Albumin Sugar Microscopic

1.019 Neg. Neg. Neg.

Diagnosis :

1. Hypertension — Arteriosclerotic Ht. disease and sinus tachycardia.
2. Normal eye examination (see specialist’s report).
3. Arthritis, rt. knee (clinically) — not shown on x-ray.
4. Dupuytren’s Contracture, rt. hand and foot.
(e) Plaintiff was not given a physical examination by the Veterans Administration subsequent to November 21, 1958.
12. On January 22, 1959, the Veterans Administration rated plaintiff and the rating sheet reads in pertinent part as follows:

Type of rating: Initial

J. Original claim.
I. Service-connection for chalazion of the lower right eyelid, chondromalacia of the right knee due to septic arthritis, Dupuytren’s contracture, right hand and right foot, hypertensive vascular disease with high blood pressure and albuminuria.
F. A chalazion on the lower right eyelid was noted only at time of discharge on 10/17/58 but is not found on cited VA examination. He was in the hospital from 6/4/57 to 7/9/57 for infectious arthritis of the right knee and again from 9/12/58 to 9/16/58 when a diagnosis of chondromalacia of right patella due to septic arthritis was made. The present examination finds the right knee normal on X-ray with only finding of slight crepitus on motion.
*540 Dupuytren’s Contracture of the right hand and right foot was noted on September 1958 and on discharge examination. The cited VA examination finds the same in the right palm (4th metacarpal area) with fist closure and grip normal. On the right foot there is some contracture on the medial plantar surface with no described disability.
The first showing of hypertension was on routine examination on hospitalization from 10/31/55 to 11/4/55 when blood pressure reading.was 154/104. At the time of discharge from the service, hypertension and albuminuria diagnosed. VA examination makes a diagnosis of hypertensive arteriosclerotic heart disease with a reading of 196/118 with normal urinalysis. Heart size is shown as normal on X-ray.
7005-420-SF
5009-AJ
5099-AZ
6099-K6
1. Incurred PL 28/82 Sec. 313, PL 85-56 30% from 10/18/58 ARTERIOSCLEROTIC HEART DISEASE
2. Incurred PTE Sec. 331, PL 85-56 0% from 10/18/58 [5] ARTHRITIS, RIGHT KNEE, INEECTIOUS dufuytren’s CONTRACTURE, RIGHT HAND AND RIGHT ROOT CHALAZION, RIGHT LOWER LID 32. NO COMBAT
VB8-2507 for 11/21/63
13. The Adjudication Officer of the Regional Office of the Veterans Administration, Los Angeles, California, advised plaintiff of the rating set forth in finding 12, supra, by letter dated January 26,1959, the text of which reads as follows:
Your claim for compensation has been considered and a decision rendered that you are 30% disabled from disabilities established as being service connected. You are therefore eligible to receive $55.00 monthly from October 18,1958, subject to a waiver of part or all of your retirement as explained in the third paragraph of this letter.
Service connection has been established for: Heart condition, 30% (Korean War) condition of right knee, right hand, right foot and right lower lid.
*541 Veterans in receipt of retirement from the Armed Services may (1) elect to receive compensation or pension in lien of retirement pay or (2) where the amount of retirement received is in excess of compensation or pension payable and is based on physical disability, or on age or length of service in the case of former members of the Regular Establishment, that portion of retirement pay and allowance equal to the amount of compensation and pension may be waived.
A decision on your part that you do not desire compensation or pension at present will not bar you from subsequently electing to receive such benefits from the Veterans Administration. You may contact the office paying your retirement to ascertain your rights as to a subsequent re-election to receive retirement after it has been waived. The amount of future compensation or pension may change on the basis of evidence subsequently received, including examination reports.
Four copies of VA Form 8-651 are enclosed and if ■you elect to waive all of your retirement pay, or that portion equal to the amount of compensation payable, Section I should be completed. You may retain one copy for your records, with three signed copies being returned to this office. If you wish to continue receiving retirement, it is requested that you notify this office immediately. In the event no reply is received from you, it will be presumed that you do not desire to receive compensation at present.
14. After plaintiff received the letter from the Veterans Administration, dated January 26,1958 (referred to in finding 13, supra), he went to Norton AFB Hospital and learned that both Captain Newsom and the NCOIC of the administration section of the hospital with whom he had previously talked had been transferred.[6] The new NCOIC referred plaintiff to the legal department at Norton. Plaintiff presented the above-mentioned letter to a legal officer and advised him of the factual circumstances leading to his going to the Veterans Administration for a physical examination and that Captain Newsom and the former NCOIC to whom he was to report the findings of the Veterans Administration had been transferred from Norton. The legal officer said that the only thing he could do was to advise plaintiff to file an application with the Air Force Board for Correction of Military Records.
*542 ,15. It is reasonably clear from the evidence that plaintiff went to the Veterans Administration for a physical examination under the impression that the report and evaluation of the Veterans A dministration would 'be reviewed by appropriate officials of the Air Force for the purpose of determining his eligibility for disability retirement.
16. Plaintiff replied to the Veterans Administration letter of January 26, 1959[7] by letter dated February 18, 1959, which reads as follows:
In acknowledging your kind letter of January 26, 1959 I wish to advise you that I have not as yet been granted retirement pay by the Armed Forces, nor have I accepted readjustment pay which was offered.
I have this date submitted to the Department of the Air Force an Application for Correction of Military Record. It is my expectation that on the basis of this application I will eventually be placed on the physical disability retired list. At that time I will notify you at once.
Pending action of the Department of the Air Force it is my desire that compensation due me from the Veterans Administration be retained by you subsequent to an election to be made by me at a later date.
17. Under date of February 18, 1959, plaintiff submitted to the Air Force Board for Correction of Military Records, an application requesting that his military records be corrected to “Rescind the Release from Active Duty dated 17 October 1958 and in lieu thereof authorize physical disability retirement effective from that date.” Plaintiff advised in his application that he desired to appear before the Board; that he would be represented by counsel, designated as The American Legion, Washington, D.C., and also stated as follows:
A medical examination made at Norton Air Force Base on 26 August 1958 gives the following diagnoses: (1) Chalazion, lower lid, right eye; (2) Chondroma-lacia, right knee, due to septic arthritis, 1957; (3) Dupuytren’s contracture, right hand, right foot; and (4) Hypertensive vascular disease, type undetermined, manifest by elevation of blood pressure and albumineria. I believe that on the basis of such diagnoses and report *543 I should have been ordered before a Physical Evaluation Board, and that failure to do so constituted an injustice.[8]
In support of his application, plaintiff submitted a photostatic copy of the Veterans Administration letter dated January 26, 1959,[9] and under the heading “Bemarks”, further stated:
I first entered the military service in April 1941 and served on active duty through January 1946. I reentered service on 9 October 1950 and was separated on 17 October 1958. At time of original entry and subsequent reentry there were no evidences of any physical disability.
The records will show that I was hospitalized in Furstenfeldbruck, Germany, in 1955 for hypertension. This was the first indication I had of any physical disability. Subsequently I was hospitalized for arthritis.
In 1958 I was Squadron Commander of the 1981st AACS Squadron, Nouasser, Morocco. I was returned to the United States for separation and ordered to Norton Air Force Base, San Bernardino, California, for separation. While at the latter Base I was examined by a Medical Board and the diagnoses made as shown in Block 14 on this form DD-149. I was released to inactive duty with no further action on the part of the Air Force, but I was advised to apply to the Veterans Administration.
Immediately after discharge I filed claim with the Veterans Administration. On the basis of their detailed examination I was held to be service-connected for: ‘Heart Condition, 30% (Korean War) condition of right knee, right hand, right foot and right lower lid,’ which in combination were rated 30% m degree. Since this rating _ was made on the basis of the Schedule for Bating Disabilities it is evident that on date of my separation from the Air Force I was in fact 30% disabled.
I contend that had I been ordered before a Physical Evaluation Board I would have met all requirements of law for Physical Disability Betirement.
*544 It will be noted tbat plaintiff made no reference in his remarks to the period of time he was hospitalized at Lack-land AFB, Texas.
18. Plaintiff’s application for correction of his military records, together with all of his service medical and clinical records, and the medical, clinical and physical examination records of the Veterans Administration, were referred by the Board for Correction of Military Records to the Surgeon General for consideration. Such records were reviewed in the office of the Surgeon General; and the following opinion was expressed in a memorandum, dated August 5, 1959, and signed by Colonel Russell S. Leone, Chief, Physical Standards Division, Directorate of Professional Services, Office of the Surgeon General, which memorandum-opinion was sent to the Air Force Board for Correction of Military Records:
1. The applicant was examined in August 1958 and a blood pressure of 158/98, and albumin 1+ were recorded. He had previously been hospitalized for hypertensive studies and the degree of severity of this disability had always been considered mild. This separation physical was approved and he was separated on 17 October 1958 after over 12 years service.
2. On 21 November 1958 he was examined by the Veterans Administration, and as a result he was rated 30% for arteriosclerotic heart disease, with no cardiac enlargement, normal electrocardiograms, normal urinalysis, and blood pressure of 196/118, pulse 98. The other defects noted on that examination were rated 0%.
3. The applicant is of the opinion that, at the time of separation, he should have appeared before a Physical Evaluation Board and consequently retired for physical disability. In this respect, there are no defects noted in either the service hospital clinical records or the separation physical examination which would have warranted appearance before a Physical Evaluation Board. The defects in question had been adequately studied prior to separation. The award by the Veterans Administration does not imply incapacity for service, for their adjudications are independent and under different laws than those applicable to the military.
4. It is the opinion of the Surgeon General that the applicant was properly evaluated prior to his separation, that he was not unfit for further military service *545 at that time, and that an alteration of the record is not justified.
19. On January 11,1960, the Air Force Board for Correction of Military Becords denied plaintiff’s application without a hearing. The Secretary of the Board advised plaintiff of the Board’s action in a letter bearing the same date which reads in pertinent part as follows:
* * * * *
The administrative regulations and procedures established by the Secretary of the Air Force for the guidance of the Board provide that an application may be denied where the applicant has not submitted sufficient evidence to establish a showing of probable error or injustice in the case.
I regret to advise you that a careful consideration by the Board of your military record, together with such facts as have been presented by you, fails to establish a showing of probable error or injustice in your case. Therefore, in the absence of additional material evidence tending to show the commission of an error or injustice, no further action on your application is contemplated.
20. By letter dated February 1,1960, which was delivered to the Executive Secretary of the Air Force Board for Correction of Military Becords by a representative of The American Legion, plaintiff requested that the Board reconsider its decision denying his application. In response to that request, the executive secretary sent to plaintiff a letter dated June 7,1960, which reads as follows:
Your letter, with enclosure, addressed to me under date of 1 February 1960, was delivered to me yesterday — June 6th — by the American Legion.
Our records show that at the time the Board reviewed your case it had before it all your service medical and clinical records, and the medical, clinical, and physical examination records of the Veterans Administration, which included the Medical Examination accomplished on 26 August 1958, at the USAF Hospital, Norton Air Force Base, California, copy of which you enclosed with your letter of 1 February 1960. Since your letter contains no new and material evidence not previously considered by the Board, no basis has been presented which would warrant further review of your case at this time.
*546 The medical examination of 26 August 1958, reveals a slightly elevated blood pressure and albuminemia. The records show you had been previously hospitalized for hypertensive studies, and the degree of severity of this disability had always been considered mild. You were found qualified for separation and were separated 11 October 1958. Since the Veterans Administration is the government agency to evaluate physical defects which are not incapacitating for military service, you were properly advised to have the albuminemia and elevated blood pressure evaluated by that agency. In November 1958, you were examined by the Veterans Administration, following which you were rated 80% for arteriosclerotic heart disease, with no cardiac enlargement, normal electrocardiograms, normal urinalysis, and blood pressure 196-118, pulse 93. The other defects noted were rated at 0%.
It should be pointed out that an award by the Veterans Administration does not imply incapacity for military service, for their adjudications are independent and under different laws than those applicable to the military. The Air Force Surgeon General has reviewed the medical aspects of your case and has advised the Board that in his opinion there were no defects noted in either the service hospital clinical records or the separation physical examination which would have warranted appearance before a Physical Evaluation Board and that the defects in question had been adequately studied prior to separation. After review of the pertinent records and your application, the Board found that you had failed to establish that you were physically unfit for active service at time of separation; hence, you were advised of the denial of your application.
In the event you have in your possession or should obtain competent medical evidence which would tend to establish that you were in fact physically unfit for military service at time of separation, it should be forwarded to this office and the Board will be happy to again review your case. In the absence of such, however, no further action on your request is possible. I might state that it is incumbent upon the applicant to establish, unless the records themselves show otherwise, the existence of an error or injustice which warrants correction.
21. Plaintiff was not advised of the opinion rendered by the Surgeon General and given an opportunity to comment *547 on or rebut it prior to the time the Board denied plaintiff’s application.
22. Plaintiff’s petition herein was filed on May 11, 1961.[10]
23. (a) Plaintiff testified at the trial and substantially confirmed, in essential respects, the history furnished by him regarding his physical ailments, disabilities and complaints at the times he was hospitalized and given physical examinations by the Air Force prior to his release from active duty on October 17, 1958, and by the Veterans Administration on November 21,1958.
(b) Plaintiff testified that his hypertensive condition “is appreciably worse” than it was in 1955, and that since his discharge from active duty, such condition is a “little worse.” Plaintiff has been under medication periodically for the purpose of lowering his blood pressure. He has continued to experience headaches, numbness, and excessive perspiration when he exerts himself in any way. He is subject to nose bleeds and easy, excessive bleeding to any cut. He contracted bleeding ulcers in 1960.
(c) After prolonged standing and walking he still experiences a dull aching pain, weakness, fatigue and swelling in his right leg. Some time in about 1961, plaintiff’s right knee became swollen, and in 1962 a swelling occurred that developed into a severe thrombophlebitis of the veins of the right leg as a result of which condition plaintiff was bedridden with an elevated leg for a period of from seven to ten days.
(d) Plaintiff first noticed a contractive sensation in the palm of his right hand sometime in 1956, and a similar sensation in the sole of his right foot about a year later. Since that time there have been a gradual onset of tender, hard fibrous bands in these areas. The effect has been for his ring finger and little finger to contract and to be drawn toward the palm, generally in cold or damp weather, with the result that it is difficult for him to open his fingers. He suffers pain in his palm and after prolonged use of his hand, a large callous, something like a wart, forms on the palm. *548 After prolonged use, plaintiff’s right foot has a tendency to swell to such an extent that the arch touches the floor and it becomes painful and uncomfortable which interferes with his locomotion.
(e) On December 22, 1959, the Board of U.S. Civil Service Examiners for the Department of the Air Force, Norton Air Force Base, California, after reviewing medical reports covering periods plaintiff was hospitalized and physically examined by the Air Force and the Veterans Administration, cancelled plaintiff’s eligibility for employment as a “laborer (cust.) ” with the Federal Government by reason of “Hypertension.”
(f) Subsequent to plaintiff’s discharge, he made application to and was denied employment by, “Bochet Dyne, Lockheed and Bohr” because of his history of hypertension.
(g) Plaintiff has performed no active reserve duty since his separation on October 17,1958.
24. In addition to plaintiff, three qualified physicians testified as medical witnesses at the trial of this case on behalf of the plaintiff, namely: Dr. Charles G. Hutter, plaintiff’s brother, who presently specializes in orthopedic surgery and also has had considerable experience in the field of general medicine gained in private practice and as a medical officer in military service; Dr. Fred Vincent Cerini, a private practitioner specializing in cardiology who examined plaintiff on September 25,1956, recorded additional blood pressure readings two or three days after that date and again examined plaintiff on October 24, 1958; and Dr. John G. Moss, who has been a physician since 1929, employed by the Veterans Administration for the past sixteen years and is a specialist in tropical diseases with a sub-specialty in internal medicine. Dr. Moss is the consulting physician who examined plaintiff at the Veterans Administration on November 21, 1958, and signed the report of medical examination bearing that date.
25. (a) Doctor Hutter[11] testified, with respect to plaintiff’s hypertensive condition, that after plaintiff returned to the United States for separation from the Air Force, he (Dr. Hutter) advised plaintiff to consult Doctor Cerini and subsequently referred him to a physician in San Bernardino *549 where plaintiff was residing; that plaintiff came to visit him in Los Angeles from time to time and on occasions plaintiff was unable to help him do things- such as gardening and sawing logs, as he had done in years gone by; that on two occasions after plaintiff attempted to help him, plaintiff developed a very heavy pulse rate, his face became flushed, and he became faint and had to discontinue the work. The last of these episodes occurred sometime in the spring of 1959. Dr. Hutter prescribed medication, including mild tranquilizers to lower plaintiff’s blood pressure and antispasmodics that are given for gastric ulcers because they have a sedative and relaxing effect. He stated that he gave plaintiff medication on several occasions for “frank hemorrhage of the blood, vomiting of blood, bloody stools, and evidence of frank gastric hemorrhage.”
Dr. Hutter expressed the opinion that, considering plaintiff’s medical history and records, including the reports of the medical examinations made of plaintiff at Norton and Lackland, an adequate study was not made of his renal condition nor his hypertensive condition at either Norton or Lackland. He stated that at Lackland plaintiff did not receive “a medical work-up which included specific attention to hyperstension or high blood pressure.” He expressed the opinion that not just one, but repeated, blood pressure readings under different circumstances should have been taken; that often times physicians making hypertensive studies give drugs to the person being examined to ascertain the response of the blood vessels to the drugs; and that a person who shows changes in the urine with an increased blood pressure should have a complete urinary study because there is a direct correlation between the evaluation of blood pressure and changes in the kidney. Dr. Hutter stated that it was his experience, while serving in the Medical Corps during World War II, that persons with a hypertensive condition such as plaintiff’s were classified for limited military duty and retained in service; but he stated that he did not know what would happen to such a person in peacetime.
(b) Dr. Hutter testified, with respect to plaintiff’s orthopedic difficulties, that in 1962, plaintiff had a severe thrombosis of the veins of the right leg. Dr. Hutter defined thrombosis *550 as a situation involving tire vascular system in which blood clots the veins, and stated that hypertension affects the small blood vessels and the vascular system.
With respect to the diagnoses relating to plaintiff’s right knee (made at the times plaintiff was given physical examinations at the hospital in French Morocco in 1957, and at Norton AFB, Lackland AFB and the Veterans Administration in 1958,[12] and to which reference is made in the Veterans Administration “Bating” on January 22,1958) ,[13] Dr. Hutter testified that “an acute infection of a joint results in a severe amount of damage to the cartilage of the knee joint. This is most vulnerable to changes in circulation and this damage to the cartilage cannot be measured readily unless one opens the knee joint up and examines it. It is something that occurs and oftentimes does not become manifest for a number of years thereafter, until secondary changes take place in the knee joint,” and that the “change” in the cartilage in the knee joint is “usually permanent.” He testified that the term “chondromalacia” used at the time of plaintiff’s separation from the Air Force for which plaintiff was rated 0%, meant “a damage or change in the cartilage of the knee joint.” He stated, with respect to the findings at Norton and Lackland, that plaintiff’s right knee had atrophyed % inch and that this condition could have resulted from the damage or change to the cartilage in plaintiff’s right knee because “atrophy occurs because of the disuse of the knee, failure to exercise it as much as normal, or use it as much because of pain or because of physical limitation of function of the knee.”
(c) With respect to the diagnosis of Dupuytren’s contrac-ture of plaintiff’s right hand and right foot made at Norton in August 1958, at Lackland in September 1958, and at the Veterans Administration in November 1958, for which plaintiff was rated zero, this disease is defined as a disorder of the fascia (fibrous tissue under the skin) marked by shortening, thickening, and fibrosis producing a flexion deformity. Dr. Hutter testified to the effect that Dupuytren’s contrac-ture only occurs in the connective tissues of the hand or the foot; that the condition is progressive and grows rapidly; *551 and that it frequently has to be operated upon for removal of the fibrous band because it gradually contracts the fingers down to the palm of the hand and they cannot be fully extended. He testified that plaintiff’s condition has not progressed to the point that it requires surgery.
26. Plaintiff, on the advice of his- brother, Dr. Hutter, consulted Doctor Fred Vincent Cerini, a practicing physician in Hollywood, California, who examined plaintiff on September 25, 1958,[14] and on that date recorded plaintiff’s blood pressure as “running from 164 to 198 systolic, and 116 to 138, diastolic.” Plaintiff called at Dr. Cerini’s office two or three days later at which time blood pressure readings of 198 over 119 to 196 over 124 were recorded. Dr. Cerini again examined plaintiff on October 24, 1958, and recorded a blood pressure reading of 196 over 124. Doctor Cerini testified that the blood pressure readings recorded by him, particularly the diastolic, were “quite variable in an abnormal range for a man of plaintiff’s age.”
Dr. Cerini testified that the first figure in a blood pressure reading is a recording of the systolic pressure produced when-the heart contracts and propels the blood through the system. The second figure records the diastolic pressure which is the pressure that remains in the arterial system when the heart is relaxed and being filled with blood. In connection with the foregoing, Dr. Cerini stated “In other words, the pressure that is existing in the pipes, as it were, at the time there is no force behind it. This pressure is achieved by arterial contracture.” He stated that at the age of forty, a normal blood pressure would be “somewhere under 150, systolic, and under 90, diastolic, perhaps giving ourselves a little leeway in regard to the situation of the examination' and permitting another ten point rise in the diastolic pressure up to 100. Yet, the diastolic pressures in the 90’s are always very definitely suspect and we consider them abnormal, unless we can get a large number of diastolic pressure readings later on that would be under the 90 level.” Doctor Cerini explained that when high blood pressure is associated with arterial or vascular changes, it is called hypertensive *552 vascular disease. Hypertensive cardiovascular disease is similar to arteriosclerotic heart disease.
The substance of the testimony presented, and opinions expressed by, Dr. Cerini, on the basis of the history, complaints, symptoms, findings and diagnosis set forth in the clinical records and medical reports relating to the hospitalization and examination of plaintiff in Germany during October-November 1955, in French Morocco during June-July 1957, at Norton and Laddand in August and September of 1958, and at the Veterans Administration on November 21,1958, as well as on the basis of his own examinations of plaintiff in September and October 1958, are as follows:
(a) The findings in the medical records relating to plaintiff’s hypertension and physical examination in Germany during the period October 31 to November 14, 1955, show that by that time, as a result of plaintiff’s hypertension, “arterial changes had begun to express themselves.” The findings “arterials narrower” indicated there had 'been a decrease in the caliber or size of the minute branches of the arteries in the eyes. This is a finding indicating the possibility of hypertension disease and that a finding of such a condition “would lead us to feel that here is a case of true hypertension or high blood pressure.” The slight hemorrhage noted in the right eye disc “would indicate that the vesseled wall in that eye, one of the arteries has changed sufficiently to allow the extravasation of blood to pass through the wall of the arterial itself, due to the changes produced by the high blood pressure.” With respect to the initial impression of “Essential Hypertension with grade iii right disc,”[15] Dr. Cerini stated that such condition “would indicate a narrowing of the arterials of the retinal arteries and a light reflection that is more marked than is normal, with nicking of the veins by the arteries where one passes over the other and some extravasation of albumin, producing albuminuric spots which would be readily visible in the fundus of the eye, and possibly with flame-shaped or small petechial punctate hemorrhages.” (“Petechial” is a small spot caused by effusion of blood and “Punctate” means resembling or marked with points or dots.)
*553 (b) Dr. Cerini testified that the finding of albumin in the urine, coupled with the blood pressure reading óf 158/98 recorded in the medical report of the examination given plaintiff at Norton AFB in August 1958, “could be an indication of beginning changes in the kidney due to the circulation, secondary to the blood pressure situation. In other words, the blood pressure is an indication usually of some arterial changes that are occurring.” With respect to the notation “white blood cells 10 to 12”, which is referred to in the report of medical examination of plaintiff made at Lack-land AFB in September 1958, (which finding was made at the time plaintiff was examined at Norton on August 26, 1958), Dr. Cerini expressed the opinion that such a finding would be significant in indicating a hypertension. He testified to the effect that the presence of albumin in the urine and the blood pressure reading of 158/98 in said report of medical examination at Norton, “would make the kidneys rather suspect of being the source of his [plaintiff’s] hypertensive condition” and that in addition to the chemical tests of the blood, “we would like to see various tests done in regard to the kidneys”, including an intravenous pyelogram (X-ray of the kidneys), an analysis of urine present in the kidneys obtained by instruments injected into the kidney through the ureters and urinary bladder, aortographs (X-rays disclosing the relative size of the arteries and kidneys), electroencephalograms, lumbar puncture to ascertain the presence of abnormal kidney substances in the spinal fluid, electrocardiograms and fluoroscopic chest X-rays to ascertain the size of the ventricles as affected by abnormal pressures. Dr. Cerini testified that over the past several years “we have been doing such tests as aortographs, where there is a question of difference in size of the kidneys in anyone with high blood pressure. We don’t do it in all cases. We would like to do it in all cases as we feel that a complete survey should include aortographs. This involves giving the patient another dye in the arterial-intravenous system; then seeing the size of the arteries in relation to the size of the kidneys.” He further testified that “electroencephalograms are done rather routinely in these cases. Sometimes, and in most instances, I feel that a lumbar puncture should be done to determine if *554 there are any undue chemical substances or if they are in the right amount in the spinal fluid in any case of hypertension. In regard to the heart, of course, sometimes rather extensive study should be done, but basically, you should have an electrocardiogram, fluoroscope chest x-ray, and studies in regard to the size of one ventricle as opposed to the other, to see whether any undue pressures are being exerted by the high blood pressure on the cardiovascular system.”
(c) With respect to the findings noted in the report of medical examination by plaintiff by the Veterans Administration on November 21,1958, Dr. Cerini stated, in substance, that epistaxis (meaning nose bleeds) is associated with a hypertensive condition in many instances, and that nose bleeds are caused by arterial and venous changes in association with high blood pressure. He stated that on exertion, “dyspnea” (defined as difficulty inbreathing), associated with headaches and dizziness, could be part of the symptom complex of hypertension. He testified that the numbness in plaintiff’s right arm (noted in the Veterans Administration medical examination report dated November 21, 1958) [16] is one of “many symptoms” that “we would accept as possibly due to the high blood pressure in a given instance. We could associate some numbness in the arm with the rapid heart rate and the elevated blood pressure.” He stated, in effect that there may be periods of remission as in any disease process, in which there would be an absence of albumin, narrowed arterials, hemorrhaging and other signs, but the disease process would still be present.
(d) Dr. Cerini testified, in substance, that the brain, heart and kidneys are the three main organs which are affected by complications that may arise as a result of a person having high, sustained blood pressure with a diagnosis of hypertension. He stated that “One, two or perhaps all three of these systems might be affected.” The conditions in these three may change in various ways, either slowly or rapidly. The basic damage that may occur in these organs results from arterial changes that cause poor oxygenation of tissue in these regions. When there are arterial changes that impede the *555 flow of blood to these organs, they do not receive sufficient oxygen. The basic form of treatment of a person who has hypertension is to keep him on a diet that is salt-free and maintains his best body weight. Such a person should not be exposed to exciting or difficult situations that might place him under emotional or physical stress and strain. Such individuals do better under medication, and various medications are used to achieve improved circulation by keeping the arteries from becoming spastic or contracted, and to reduce blood pressure. Some medications are used that have a specific effect upon a certain organ, such as improvement of circulation in the kidneys which in many instances reduces blood pressure. If a hypertensive person does not conform to the required diet, shield himself from overphysical exertion and nervous stress or follow the regimen outlined above, there is a likelihood of some of the stated complications arising.
¡27. (a) Doctor Moss testified and confirmed the entries made by him in the Veterans Administration report of medical examination, dated November 21, 1958, and signed by him on December 4, 1958.[17] He testified, in substance, that plaintiff said he was experiencing frequent epistaxis, headaches and occasional dizziness; and that he had numbness down the inner aspect of his right arm for the past 18 months and that his arm felt constantly asleep. Dr. Moss stated that plaintiff did not complain of any precordial pain or palpitation, either at the time of the examination or previous thereto, but that plaintiff did complain that he had exer-tional dyspnea and that he tired easily when he did anything arduous or that required some exertion.
He testified to the effect that the physical examination revealed no cyanosis, dyspnea, nor venous engorgement; that the heart tones were forceful and regular but rapid; and that he heard no murmurs or palpated no thrills. He stated that the peripheral vessels (meaning those “away from the heart”), i.e., the radial, posterior tibial and dorsalus-pedas pulses, were felt and found to be slightly thickened; that, however, there were no pedal edema and that the peripheral pulses were found to be equal and elastic. He stated that the *556 respiratory readings recorded were not abnormal and that tbe diagnosis of “sinus tachycardia” means that plaintiff bad a rapid heart; that a chest X-ray was taken that “demonstrated no cardiomegaly, which means enlargement or malformation of the heart.”
(b) Dr. Moss testified that the blood pressure readings recorded when he examined plaintiff were, for a man of his age, 40, abnormally high and that such readings should be classified in the “moderately severe category.” He stated that high blood pressure is more serious when it is found in a young man than in an older one because as a man grows older his blood pressure tends to rise or increase and his arteries to harden, causing pressure with resultant tension; that, in his opinion, the blood pressure readings and diagnosis of “Hypertension — Arteriosclerotic Ht. Disease” recorded on the above-mentioned medical examination report would be cause for plaintiff to be rejected for life insurance because he would be a poor insurance risk.
Dr. Moss expressed an opinion to the effect that a person with blood pressure to a degree indicated by the readings recorded as to plaintiff at the time he was examined at the Veterans Administration on November 21,1958, should have a thorough hospital work-up and stated as follows:
Now, I don’t know how much of a work-up Mr. Hutter had, but because hypertension is so diverse in its causes and its final results to the human body, we agree that when a person has an abnormal tendency — I wouldn’t call this a malignant hypertension, but when he has hypertension of this degree, he should have a full workup, with which to rule out such things as a pheochromo-cytoma, (a chromaffin cell tumor of the adrenal madulla and other tissues, kidney function tests, and aortograms) and what we know now, too, as primary aldosteronism; three, is renal artery obstruction, and, of course, along with that should go kidney function tests, IBP, to rule out unilateral renal hypertension.
(c) Dr. Moss testified to the effect that hypertension leads to other complications of a more serious nature and that to avoid such complications, a person with hypertension should abide by a rather strict regimen to avoid possible complications. He should avoid excess in all things, e.g., overweight, overdrinking, oversmoking; and that the hypertensive person *557 should try to avoid emotional upsets and be given medication to keep his blood pressure down. Dr. Moss further testified that if he made a diagnosis of “hypertension, arteriosclerotic heart disease with sinus tachycardia,” as to a man in military service, he thought he would “have him surveyed for possible retirement, or at least be put on a limited status”; that such a man should not perform “arduous work of any kind, or strenuous exercise, because anything not in moderation will raise the blood pressure . . .”; that he would not “encourage” anyone with the blood pressure reading recorded as to plaintiff at the time he was examined at the Veterans Administration “to carry full (military) duties,” or to “recommend” that he do so, and that it would not be “the plausible thing to do.” Dr. Moss expressed the opinion that on the basis of the findings set forth in the report of medical examination covering plaintiff’s hospitalization in Germany, during October-November 1955,[18] he did not “think” he would have released plaintiff from the hospital to flying status duty.
(d) With respect to the diagnosis “arthritis, rt. knee (clinically) — not shown on x-Kay” and “Dupuytren’s Con-tracture, rt. hand and foot”, Dr. Moss supplemented the entries he made in said report of medical examination of plaintiff at the Veterans Administration[19] by testifying that such diagnoses were made “mostly by history.”
28. A summary of plaintiff’s blood pressure readings, subsequent to October 9, 1952,[20] as established by the evidence of record, is set out below:

Date

11/4155-
11/4/55-
11/1/55-
11/2-3/55-
6/4/57-
8/26/58-
8/27/58-
9/12/58--
9/12/58--
9/25/58-.
9/28/58 (Approx, date)..
10/24/58__
11/21/58-

Purpose

History (Germany)___
Physical Examination (Germany)_
Physical Examination (Germany)_
Nursing Notes (Germany)_
Nursing Notes (Germany)._
Nursing Notes (Prench Morocco)_
Medical Examination (Norton AFB)_
Electrocardiographic Record (Norton)...
History (Lacldand AFB)..
Physical Examination (Lackland AFB)__
Dr. Oerini.....
Dr. Oerini....
Dr. Oerini______
V.A. Medical Examination-__

B/P

154/104.
136/90-84.
150/100 (after cigarette) 118/80.
110/80 (two additiona similar readings). 130/90.
158/98.
158/98.
170/118.
170/115.
164/116 and 198/138. 198/119 and 196/124. 196/124.
196/118 (Sitting).
212/112 (Sitting-after exercise).
200/118 (2 Min. after exercise).
*558 29. (a) The following are extracts from the Veterans Administration Schedule for Eating Disabilities:

THE CARDIOVASCULAR SYSTEM

4. Arteriosclerotic Heart Disease. — Arteriosclerotic heart disease is a disease of the heart due to diminution of blood supply to the heart muscle on account of arterio-sclerotic narrowing of the lumen of one or both coronary arteries. Any sudden development, during service, of coronary occlusion or thrombosis is to be service connected. Mere identification of coronary heart disease upon routine examination early in service is not a basis for service connection.
5. Hypertensive Cardiovascular Disease. — The diagnosis of arterial hypertension is not warranted unless there is a persistent resting elevation of blood pressure of systolic, 150 mm. of mercury or above and a diastolic of 90 or above. The cause of hypertension is unknown in the vast maj ority of cases. Elevation of systolic blood pressure due to aortic insufficiency or thyrotoxicosis and elevation of systolic or disastolic blood pressure due to nephritis should not be rated separately from the primary disease. A hypertension may exist for years without causing symptoms. On the other hand, if sufficiently severe, it may so increase the cardiac load as to result in hypertrophy of the cardiac muscle or in cardiac dilatation and decompensation. If the hypertension is long continued, there may occur an arteriosclerosis of uneven distribution which often involves the vessels of one organ to a greater degree than those of the rest of the body. If it is of sufficient degree to cause significant impairment of the circulation to the organ, it will cause symptoms in accordance with the organ involved and with the degree of impairment. In the brain it may cause symptoms and signs warranting a diagnosis of cerebral arteriosclerosis or thrombosis with hemiplegia. A nephrosclerosis may occur with impairment of renal function. In the heart myocardial damage or coronary occlusion may result. But it should be borne in mind that arteriosclerosis occurs with advancing age without a preexisting hypertension and it may occur in some younger individuals who are predisposed to arterial changes. The existence of an arteriosclerosis does not therefore imply or indicate a previous hypertension. If any of the above mentioned arteriosclerotic manifestations are diagnosed in a veteran who presents a service *559 connected hypertension, they should also be held to be service connected through their relationship to the hypertension.

DISEASES OF TEE HEART

iji % % #
7005 [21] Arteriosclerotic heart disease
During, and for 6 months following acute illness from coronary occlusion or thrombosis, with circulatory shock, etc_ 100
Following typical history of acute occlusion or thrombosis, more than strictly sedentary employment precluded_ 80
Following typical history of acute coronary occlusion or thrombosis as above, or with history of substantiated repeated anginal attacks, more than light manual labor not feasible_ 60
Following typical coronary occlusion or thrombosis, or with history of substantiated anginal attack, ordinary manual labor feasible- 80
* * .1: * *
7101[22] Hypertensive vascular disease (essential arterial hypertension)
Diastolic pressure consistently over 130 and severe symptoms_ 60
Diastolic pressure consistently over 120 and moderately severe symptoms_ 40
Diastolic pressure consistently over 110 with definite symptoms_ 20
Diastolic pressure consistently over 100_ 10
(b) As set forth in finding 12, supra, plaintiff was awarded a disability rating of 30 percent by the Veterans Administration under Code “7005-A-20-SF Arteriosclerotic Heart Disease.” It will be noted in (a), supra, that according to the Veterans Administration Schedule for Eating Disabilities, a 30 percent rating under Code 7005 is authorized for—
Following typical coronary occlusion or thrombosis, or with history of substantiated anginal attack, ordinary manual labor feasible.
It is the contention of defendant that the medical description for plaintiff’s ailment upon which disability was predicated is “hypertensive vascular disease (essential arterial *560 hypertension)”, which is listed under said schedule as Code 7101 (see (a), supra); and, therefore, in view of the fact that, with the exception of the blood pressure readings recorded by Dr. Cerini,[23] all diastolic blood pressure readings are less than 120, the maximum rating that could be authorized for hypertensive vascular disease under the schedule is 20 percent. However, in addition to the significance that can be attached to the fact that the blood pressure readings recorded by Dr. Cerini (three of which readings showed diastolic pressure over 120)[24] were the nearest dates to plaintiff’s release, it should be pointed out that the Veterans Administration Report of Medical Examination (see finding 11, supra) reflects diagnoses, among others of “Hypertension-Arteriosclerotic Ht. Disease and Sinus Tachycardia.” Plaintiff contends that on the basis of such diagnoses (and not solely on the basis of “hypertensive vascular disease”) plaintiff was given a 30 percent disability rating under V.A. Code 7005; that on the basis of the blood pressure readings of Dr. Cerini, plaintiff was entitled to a 40 percent disability rating for his hypertension alone; that under V.A. Schedule for Rating Disabilities, Diagnostic Code #7014, sinus tachycardia (included in the above-quoted diagnosis) is rated 10 percent disability if “persistently 100 (pulse rate) or more in recumbent position.” The Veterans Administration examination report of November 21, 1958, shows that plaintiff’s pulse was 98, sitting, and that no recumbent pulse was taken. According to Dorland’s Medical Dictionary, 22nd Edition, “The pulse rate . . . normally varies from 70 to 72 in men . . .” On the basis of the foregoing, it would appear that defendant’s said contention is not valid, and that the disability rating of 30 percent given plaintiff by the Veterans Administration is conservative, reasonable and justified.
30. The following pertinent Air Force regulations were in effect on October 17,1958, the date plaintiff was released to inactive duty:
(a) AFM 35-4,15 August 1958, “Physical Evaluation For Retention, Retirement, and Separation.”
*561 SectioN A. Definitions
(1) Par. 1 m.
Physically Unfit or “Unfit”: Physical inability to perform the duties of the grade held, which are required during the performance of full military duty, field as well as garrison, in both peace and war.
(2) Par. 1 r.
Duties of Grade: The duties of the particular grade, which are required in the performance of full military duty, field as well as garrison, in both peace and war.
(3) Par. 1 i.
Disability of Permanent Nature: If it is medically ascertained that a member’s combined percentage of disability, computed by the application of the Veterans’ Administration schedule of rating disabilities, may not, with reasonable expectation, change by a ratable amount within the 5-year statutory period, or if the combined percentage is 80 percent or more and may not, with reasonable expectation, later reduce below 80 percent, the disability should be considered permanent.
Section B. Medical Board
(1) Par. 43. Guide for Medical Examiners.
When the report of proceedings of the medical board is to be presented to a physical evaluation board, the Manual for Medical Examiners of the Veterans’ Administration will be used as a guide. Any of the editions of 1940,1946,1950, or AFP 160-7-1 are applicable. The recording of defects in accordance with the manual for medical examiners is desired because Chapter 61 of Title 10, United States Code, requires the application of Veterans’ Administration principles in the evaluation of disabilities.
(b) AFM 160-1, 30 April 1953, “Medical Service-Medical Examination.”
Foreword
(1) Par. 1. Purpose and Scope.
This Manual establishes administrative procedures, examination techniques, and medical standards for all medical examinations normally given by the Air Force.
Section I. General Information and Definitions.
(1) Par. 1. Medical Standards.
a. Purpose. The purpose of medical standards is to insure the greatest efficiency and uniformity in medical *562 selection and classification of Air Force personnel, as follows:
(1) Selection of personnel who are physically qualified for military service and who will remain so for a reasonable period.
(2) Classification of personnel under the physical profile serial system to assure efficient assignment and utilization.
(3) Selection of personnel for duty as commissioned officers and for schools leading to commissioned rank.
(4) Selection of personnel for aircrew training and for participation in regular and frequent aerial flights.
(5) Determination of qualification for continued service and promotion.
(6) Determination of physical qualification for separation from the service.
5. Interpretation:
*¡í íjs íjí »?•
(2) For Continued Performance of Duty. Appropriate consideration will be given to a person’s records of performance of duty, age, grade, and military specialty. Trained and experienced personnel will not be summarily disqualified. Their value to the service and future capabilities must be carefully considered. However, a person will not be found fit for the performance of duty unless he is physically capable of performing duties commensurate with his grade, experience, and training at stations throughout the world. For aircrew members the physical standards will be interpreted so as not to compromise flying safety, the efficient performance of flying duty, or the member’s well-being.
Section IY. Examination Techniques.
(1) Par. 29. Heart and Vascular System.
(5) Blood Pressure. Will be determined with the individual relaxed and in the sitting position, preferably employing a mercurial sphygmomanometer. Prolonged bed rest will not precede the determined blood pressure, however, due regard must be given to physiologic effects such as excitement and recent exercise. No examinee will be rejected as the result of a single reading. Any individual whose systolic blood pressure on initial examination is found to be greater than 150-mm. of mercury or less than 100-mm., or whose diastolic blood pressure is found to be greater than 90-mm. or less than 60-mm., will be subjected to a determination of systolic and diastolic blood pressure, morning and afternoon, *563 daily for three consecutive days. All readings will be recorded on SF 88.
(2) Par. 41. Urinalysis.
. . . When albumin and/or casts are found in the urine, urinalysis should be repeated not less than twice a day on two or more successive days. If the urine shows albumin and/or casts and.this condition of the urine is associated with enlargement of the heart, high blood pressure, and other signs or symptoms, a diagnosis of disqualifying cardiovascular-renal disease may be made immediately.
Section VI. Physical Standards for Commission and Flying.*
(1) Par. 97. Heart and Vascular System — Causes for Rejection.

a. For Commission:

* * * * *
(6) Hypertension evidenced by an average systolic blood pressure of 150 mm. of mercury or more or an average diastolic blood pressure of 90 mm. or more if the candidate is over 35 years of age, and an average systolic blood pressure of 140 mm. or more, or an average diastolic blood pressure of 90 mm. or more if the candidate is 35 years of age or under.
(2) Par. 115. Blood Pressure and Pulse — Causes for Rejection.

a. For Commission:

❖ ❖ * * #
(3) Hypertension evidenced by an average systolic blood pressure of 150 mm. or more or an average diastolic blood pressure of 90 mm. or more if the candidate is over 35 years of age, and an average systolic blood pressure of 140 ¡mm. or more, or an average diastolic blood pressure of 90 mm. or more if the candidate is 35 years of age or under.
The Veterans Administration Schedule for Rating Disabilities, Loose Leaf Edition — 1957, provided as follows:
1. Essentials of Evaluative Rating. — This rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The percentage ratings represent as far as can practicably be determined the average impairment in earning *564 capacity resulting from such their residual conditions in civil occupations, of the various grades of severity as set forth with due regard, to previous determinations for compensation or pension purposes. Generally, it may be said that the degrees of disability specified are considered adequate to compensate for considerable loss of working time from ex-acerbations, or illnesses, proportionate to the severity of the several grades. For the application of the schedule, accurate and fully descriptive medical examinations are required, with the emphasis at all times upon the limitation of activity imposed by the disabling condition.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States 30 percent disability retirement pay from the date of his release from active duty on October 18,1958, to date of judgment, less disability compensation received from the Veterans Administration, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47 (c) of the rules of this court.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on August 9, 1965, that judgment for the plaintiff be entered for $11,817.77.

 Arteriosclerotic heart disease is the result of high blood pressure associated with arterial or vascular changes. It is quite similar to hypertensive cardiovascular disease.

 It should be noted that regardless of the doubt concerning the admissibility of the evidence in Furlong, supra, the court did consider it competent in a limited manner.

 AFM 160-1, 30 April 1953 entitled, “Medical Service — Medical Examination” which established procedures and techniques for all medical examinations normally given by the Air Force, and which was in effect the date plaintiff was released from active duty, seems to require a much more thorough analysis of blood pressure readings than plaintiff was afforded. See Finding 30(b).

 Blood pressure readings recorded as to plaintiff subsequent to October 9, 1952, are set forth, in finding 28, infra.

 See finding 4, supra.

 10 U.S.C. 1201 provides, in substance, that upon determination by the Secretary (of the branch of the Armed Forces concerned) that if a member of the Armed Forces is found to be unfit to perform the duties of his office, grade, rank or rating because of physical disability incurred, while entitled' to basic pay, the Secretary may retire (such), member (“with retired pay to be computed under section 1401”), if the Secretary also determines that—
“(1) ibased upon accepted medical principles, the disability is of a permanent nature;
“(3) * * *
“(B) the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination; * * *”

 See Joint Exhibit 20. This report shows that plaintiff was examined on> November 21, 1958; that he signed it on the same date; that the examining physician, Dr. John G. Moss, signed the report on December 4, 1958; and that it was signed by the reviewing officer on December 5, 1958. The report is referred to herein as being datedl November 21, 1958.

 The minimum compensable rating in the Veterans Administration Schedule For Rating Disabilities is 10%. If there is a disability, but less than 10% incapacitating, it is rated 0%.

 See findings 10 (a) and (b), supra»

 See finding 13, supra.

 10 U.S.C. 1552 (1948), 70A Stat. 116, August 10, 1956, reads in pertinent part: The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice. * * *

 See finding 13, supra.

 On December 14, 1961, an order -was entered allowing a motion filed by defendant for leave to withdraw tbe counterclaim contained in its answer herein filed September 25, 1961.

 See finding 24, supra.

 See findings 5, 6, 8, 9 and 11, supra,

 See finding 12, supra,

 See finding 24, supra.

 See finding 4(c), supra.

 See finding 11(d), supra.

 See findings 11 and 24, supra.

 See finding 4, supra.

 See finding 11(d), supra.

 Blood; pressure readings recorded to and including October 9, 1952, are set forth in finding 3, supra.

 This is a diagnostic code number.

 Ibid.

 See findings 26 and 28, supra.

 Ibid.

AU standards in this section listed as causes for rejection for commission will be causes for rejection for flying . . .